2003 UT 29

The COMMITTEE OF CONSUMER SERVICES, Department of Commerce, State of Utah, Petitioner,

v.

PUBLIC SERVICE COMMISSION OF UTAH, Questar Gas Company, and Magnesium Corporation of America, Respondent.

Nos. 20000893, 20020810.

Supreme Court of Utah.

Aug. 1, 2003.

See also 34 P.3d 218.

Reed T. Warnick, Asst. Att'y Gen., Robert A. Peterson, Salt Lake City, for petitioner.

Michael Ginsberg, Asst. Att'y Gen., Gary G. Sackett, Sander J. Mooy, C. Scott Brown, Colleen Larkin Bell, Salt Lake City, for respondent.

DURHAM, Chief Justice:

¶ 1 The Committee of Consumer Services (Consumer Services), seeks review of an order by the Utah Public Service Commission (the Commission) approving a gas rate increase. The increase was sought to cover costs resulting from the construction and operation of a carbon dioxide ($CO_2$) processing plant by an affiliate of Questar Gas Company (Questar Gas).

## BACKGROUND

¶ 2 On November 25, 1998, Questar Gas submitted an application to the Commission under Utah Code sections 54–4–1 and 54–7–

12(3)(a) and commission rule 746–100–3 for approval of a proposed contract with its affiliate, a Questar Pipeline Company subsidiary (Questar Pipeline). The contract provided that Questar Pipeline would construct a processing plant ($CO_2$ plant) to reduce $CO_2$ in coal seam gas that Questar Pipeline was transporting interstate to external destinations. The processing plant was needed because the $CO_2$ brought in by upstream gas caused gas heat (BTU) levels in Questar Gas service areas that, according to Questar Gas, posed a safety risk to its customers.[1] In its application, Questar Gas also requested authorization to include the costs of constructing and operating the $CO_2$ plant in calculating its account 191,[2] ultimately transferring these costs directly to ratepayers.[3] In its December 3, 1999 report and order, the Commission denied Questar Gas's request on the basis that the $CO_2$ plant costs were not the kind of expenses that could be allowed under Utah Code section 54–7–12(3)(d)(i), which is known as the pass-through statute. *In re Questar Gas Co.*, 1999 Utah PUC Lexis 86. The Commission acknowledged its own authority to fix rates and set accounting practices for utilities but recognized as well that "when we do change rates we must follow procedures which ensure rates will be just and reasonable," and that "whatever the procedure by which rates are changed, the utility still has the burden of establishing that the rates will be just and reasonable." *Id.* at *7, 9. The Commission noted that Questar Gas had an additional burden to establish the prudence of its contract with Questar Pipeline because of their affiliate relationship. *Id.* at *11 n. 2 (citing *U.S. West Communications v. Utah Pub. Serv.*

*Comm'n*, 901 P.2d 270 (Utah 1995)). The Commission purposely did not address whether Questar Gas's decision to enter into the contract with Questar Pipeline was prudent, whether the terms of the contract were reasonable, or whether the expenses incurred under the contract were "legitimate and reasonable utility expenses that may be recovered from utility customers." *Id.* at *13. Rather, it determined that, even assuming the prudence of the contract and the reasonableness of its terms, Questar Gas had failed to present substantial evidence that the resulting rates would be just and reasonable. *Id.*

¶ 3 Questar Gas sought judicial review of the Commission's decision in this court. In *Questar Gas Co. v. Utah Pub. Serv. Comm'n*, 2001 UT 93, 34 P.3d 218, we set aside the Commission's report and order, holding that Questar Gas's use of account 191 to recover costs was not limited to requests under the pass-through statute. In that case, Questar had argued that the use of account 191 "is ... a separate mechanism—with its own procedures—used to facilitate the transfer of certain unexpected costs on a dollar-for-dollar basis from the utility to its customer." *Id.* at ¶ 6. We based our decision on the Commission's own prior practices, noting that the Commission, when reviewing Questar Gas's use of account 191, determined in an informal proceeding whether the resulting rates were "just, reasonable and cost justified" and whether their approval was "in the public interest." *Id.* at ¶ 14. We held, further, that the 191 account mechanism should yield a just and reasonable rate because Questar Gas's tariff, previously approved by the Commission, already set out the formula

---

1. According to Questar Gas, BTU levels in its service area were historically high relative to the rest of the United States. Appliances in Questar Gas's service area had therefore originally been set to operate in this higher BTU range. As a result of the decrease in BTU content, Questar Gas had previously filed for and received the Commission's approval to change the standard BTU settings set forth in its tariff, on which vendors and manufacturers rely, effective May 1, 1998. However, Questar Gas maintained in the $CO_2$ plant application that resetting all customer appliances to this new range would be prohibitively expensive, and that treating the gas in the $CO_2$ plant was a preferable solution.

2. Account 191, part of the Uniform System of Accounts set forth in 18 C.F.R. § 201 (2003) and adopted by the Commission, *see* Utah Admin. Code R746–320–7 (1993), allows gas utilities to recover gas costs directly from consumers. *See Questar Gas Co. v. Utah Pub. Serv. Comm'n*, 2001 UT 93, ¶¶ 8–9, 18, 34 P.3d 218.

3. Questar Gas estimated the annual cost at between $7.5 and $8.5 million, or $8 to $9 per customer, which it would pay to Questar Pipeline under the proposed contract.

by which rates would be determined, based on the costs and revenues assigned to different accounts. *Id.* at ¶ 15. We remanded the case to the Commission for further consideration in accord with the 191 account mechanism procedures.[4] *Id.* at ¶ 20.

¶ 4 On December 17, 1999, over a year before we issued our 2001 decision, Questar Gas filed a general rate proceeding, which included a request under Utah Code section 54–7–12(3)(a) for interim rate relief of over $7 million annually to cover the $CO_2$ plant operating costs. Questar Gas also included previously unrecovered $CO_2$ plant operating costs in its general assessment of its total revenue deficiency. Questar Gas did not, however, seek approval of its contract with Questar Pipeline. The Commission held a hearing to consider Questar Gas's request for interim rate relief and granted the request on January 25, 2000. On February 14, 2000, Consumer Services petitioned the Commission for reconsideration or rehearing regarding the interim rate increase, arguing that the increase was not legally proper, factually supported, or in the public interest. By declining to respond to Consumer Services's request, the Commission affirmed its January 25th order. On June 2, 2000, Questar Gas and the state Division of Public Utilities (the Division) filed a stipulation (the $CO_2$ Stipulation) that "resolv[ed] between them the issues of cost recovery and ratemaking treatment of gas processing costs," and agreed that annual $CO_2$ plant costs in the amount of $5 million should be passed on to ratepayers. *In re Questar Gas Co.*, 203 P.U.R.4th 356 at 29, 2000 WL 1451221 (Utah 2000). The Commission held a hearing regarding the $CO_2$ Stipulation on June 23, 2000. Subsequently, two of the intervenors in the rate proceeding, the Large Customer Group and the Industrial Gas Users, withdrew their objections to the $CO_2$ Stipulation. Consumer Services, however, continued to object. Nev-

ertheless, in its final report and order, issued on August 11, 2000, the Commission accepted the $CO_2$ Stipulation.

¶ 5 In making this decision, the Commission determined that it need not rule on whether Questar Gas's decision to contract with its affiliate Questar Pipeline was prudent. The Commission specifically acknowledged that "[t]he record is insufficient to permit us to determine whether [Questar Gas]'s analysis of options prior to early 1998 was sufficiently objective and thorough, that is, to reach a conclusion whether options were ruled in or out as a result of the influence of affiliate interests. Nor can a sufficient record be developed." *Id.* at 34. The Commission acknowledged that Questar Gas's prudence in this matter remained "[t]he most troubling question" and that the burden to demonstrate prudence was on Questar Gas. *Id.* at 35. However, the Commission went on to determine that "[o]nce coal seam gas became a persistent threat to the BTU content of [Questar Gas]'s gas supply, customer safety was threatened and an effective response was mandatory." *Id.* at 34. The Commission reasoned that it could decide the legitimacy of recovering $CO_2$ plant operating costs from ratepayers without determining whether the underlying affiliate contract was prudent because Questar Gas had not specifically applied for a decision on the latter issue. *Id.* at 35. The Commission then accepted the argument that $5 million per year, which represented 68% of the costs of $CO_2$ processing, represented a "fair and reasonable settlement of the cost recovery issue," based on the Commission's assessment of the probable result if the allocation issue had been brought before the Federal Energy Regulatory Commission (FERC) in the first place.[5] *Id.* at 36.

¶ 6 In dissent, commission chairman Stephen F. Mecham argued that since "[t]he

---

4. Based on the Commission's finding, discussed below, "that it was impossible to make a [prudence] determination because the record was insufficient and could not be created," we limited our 2001 holding to the question of "the procedure Questar [Gas] should have followed to recover processing costs incurred between June 1999 and August 2000." *Questar Gas Co.*, 2001 UT 93, ¶ 6 n. 7, 34 P.3d 218.

5. The federal government regulates pipeline companies that transport gas in interstate commerce under the Natural Gas Act, 15 U.S.C. §§ 717 *et seq.* (1992). The Natural Gas Act requires FERC's regulation to be in the public interest.

CO$_2$ gas processing plant issue turns on what [FERC] would have done had Questar Gas first taken the case there," the Commission should have required Questar Gas to obtain a ruling from FERC before making its decision. *Id.* at 60 (noting that the Commission had been "left with too many questions the answers for which [it] can only surmise"). According to Chairman Mecham, while FERC might have imposed CO$_2$ plant costs on consumers, "[i]t is just as conceivable that the FERC would have required producers to meet Questar Gas's needs" rather than forcing Questar Gas to cover the cost itself by raising rates. *Id.*

¶ 7 After the Commission refused Consumer Services's petition for reconsideration, Consumer Services sought judicial review in this court under Utah Code section 78–2–2(3)(e)(i) (2002).

## STANDARD OF REVIEW

■ ¶ 8 Section 63–46b–16 of the Utah Administrative Procedures Act governs this court's review of administrative agency decisions based on formal adjudicative hearings. Utah Code Ann. § 63b–46b–16 (1997 & Supp. 2002). The statute provides, in pertinent part, that a court may grant relief to a petitioner seeking review of a final agency action where:

(d) the agency has erroneously interpreted or applied the law;

(e) the agency has engaged in an unlawful procedure or decision-making process, or has failed to follow prescribed procedure;

. . . .

(g) the agency action is based upon a determination of fact, made or implied by the agency, that is not supported by substantial evidence when viewed in light of the whole record before the court;

(h) the agency action is:

(i) an abuse of the discretion delegated to the agency by statute;

. . . .

(iii) contrary to the agency's prior practice, unless the agency justifies the inconsistency by giving facts and reasons that demonstrate a fair and rational basis for the inconsistency; or

(iv) otherwise arbitrary or capricious.

*Id.* § 63–46b–16(4). Unless the legislature has granted discretion to an agency to interpret statutory language, we review an agency's construction of statutory provisions under a correction of error standard, granting the agency no deference. *Hegarty v. Bd. of Oil, Gas, & Mining,* 2002 UT 82, ¶ 17, 57 P.3d 1042; *WWC Holding Co. v. Pub. Serv. Comm'n,* 2001 UT 23, ¶ 8, 44 P.3d 714.

¶ 9 The parties dispute the applicable standard of review in this case. While Consumer Services contends that the correction of error standard applies and that the Commission's ruling was also an abuse of discretion, the Commission argues that the ruling was within its discretion and was supported by substantial evidence. We discuss the proper standard of review in the course of our analysis below.

## ANALYSIS

¶ 10 Consumer Services argues that the Commission abused its discretion by failing to determine whether Questar Gas's initial decision to enter into a contract with its affiliate Questar Pipeline to construct and operate the CO$_2$ plant was prudent. The Commission's obligation to make a prudence determination stems, according to Consumer Services, from the Commission's own prior pronouncements on the need for close regulation of Questar Gas's affiliate transactions.[6] Consumer Services argues further that the Commission's failure to conform to its previously-stated policy rendered its approval of the CO$_2$ Stipulation invalid as a matter of law because the prudence of the underlying contract was a necessary prerequisite to a determination that the rates proposed in the CO$_2$ Stipulation were just and reasonable. In other words, Consumer Services maintains that Questar Gas's burden of proof in estab-

---

**6.** Consumer Services cites the Commission's 1984 decision allowing the reorganization of Mountain Fuel Supply Company as Questar Corporation, *In re Mountain Fuel,* Case No. 84–057– 10, at 22–23 (Utah P.S.C. Oct. 1, 1984), in which the Commission conditioned its approval of the reorganization on continued close regulation by the Commission.

lishing that its proposed rates are just and reasonable includes the burden of showing that the underlying contract between Questar Gas and Questar Pipeline was prudent. Intervenors Crossroads Urban Center and Salt Lake Community Action Program (collectively, Crossroads) argue that Questar Gas bore this burden regardless of the affiliate relationship between it and Questar Pipeline, pointing out that, otherwise, Questar Gas would never have to justify any decisions resulting in increased costs in order to recover these costs from ratepayers. Crossroads also argues that the Commission had no authority to accept the $CO_2$ Stipulation because the stipulation was contested by some of the parties and could not, consistent with the Commission's statutory obligations, serve as a substitute for an independent determination that the proposed rate increase was just and reasonable.[7]

¶ 11 In response, the Commission argues that its decision to assign a percentage of $CO_2$ plant costs to ratepayers is within its regulatory discretion. The Commission maintains that the $CO_2$ plant was Questar Gas's only available option to ensure the safety of its customers and that therefore a determination of the prudence of Questar Gas's choice to contract with Questar Pipeline to build and operate the plant was irrelevant. Because the result was "necessary," it would not be just or reasonable to prevent Questar Gas from recovering its costs even if its decisionmaking process was flawed. Moreover, the Commission notes that the need to reduce $CO_2$ levels resulted from Questar Gas's "uniquely high BTU and $CO_2$ content standards," thus suggesting that allocating the cost to Questar Gas ratepayers was justified. The Commission argues that the cost allocation proposed in the $CO_2$ Stipulation was reasonable based on the Commission's prediction of what FERC would have done. Intervenor Questar Gas argues that the Commission's approval of the $CO_2$ Stipulation must be upheld because it is supported by substantial evidence in the record. Questar Gas faults the petitioners for failing to marshal the evidence in support of the Com-

mission's findings and to demonstrate that the evidence was insufficient. In addition, Questar Gas maintains that it met its burden to show that its transaction with Questar Pipeline was justified and that the Commission met its obligation to establish just and reasonable rates.

¶ 12 We first note that, despite Questar Gas's position on this point, the record clearly indicates that the Commission did not make a determination that the $CO_2$ plant contract between Questar Gas and Questar Pipeline was prudent. Indeed, the Commission stated that there were insufficient facts in the record for it to make such a determination, nor could a sufficient record be developed. We note further that the Commission does not contest Consumer Services's claim that a utility is generally obligated to establish that its transaction with an affiliate is prudent before receiving commission approval for the transaction, and that this prudence determination is a prerequisite to the determination of whether a consequent rate increase is just and reasonable. In fact, as noted above, the Commission explicitly recognized these obligations in its original 1998 report and order. Thus, the real issue in this case is whether the Commission may rely on a "safety exception" that relieves Questar Gas of its burden to demonstrate the prudence of its contract with Questar Pipeline to construct and operate the $CO_2$ plant under terms that caused Questar Gas to incur the costs it now seeks to pass on to ratepayers.

¶ 13 Even assuming that the requirement of a prudence review was initially within the Commission's discretion rather than a mandatory legal obligation, it is now an established Commission practice to which the Commission must adhere unless it presents "facts and reasons that demonstrate a fair and rational basis for the inconsistency." Utah Code Ann. § 63–46b–16(4)(h)(iii); *see Questar Gas Co. v. Utah Pub. Serv. Comm'n,* 2001 UT 93, ¶¶ 18–19, 34 P.3d 218. We hold that the Commission's safety rationale is nei-

---

**7.** According to the Commission, the issue of whether the Commission can accept a contested stipulation was not preserved for judicial review.

ther an adequate nor a fair and rational basis for departing from its prudence review standard. While safety concerns may have necessitated the construction and operation of a $CO_2$ plant, they do not establish who should bear the cost of these measures. If the record had permitted, the Commission could have carried out its initial obligation to review the prudence of the $CO_2$ plant contract and its terms, holding Questar Gas to its burden of establishing that its decision to enter into the contract and the costs it agreed to were prudent and not unduly influenced by its affiliate relationship with Questar Pipeline. Since the Commission found that no such record was or could be made available, it should have refused to grant a rate increase that included $CO_2$ plant costs.[8] We therefore overturn the Commission's decision to accept the $CO_2$ Stipulation and to grant the rate increase proposed therein.

¶ 14 We note that we would reach the same result under a correction of error standard because the Commission's decision to accept the $CO_2$ Stipulation's proposed rate increase constitutes an erroneous application of the law. The Commission erred by failing to hold Questar Gas to its burden of showing that the increase was just and reasonable. Section 54–3–1 mandates that "[a]ll charges made, demanded or received by any public utility ... for any product or commodity furnished or to be furnished, or for any service rendered or to be rendered, shall be just and reasonable." Utah Code Ann. § 54–3–1 (1997 & Supp.2002). As this court has previously recognized, "[t]he first prerequisite of a rate order [by the Commission] is that it be preceded by a hearing and findings. At such a hearing the legislature intended there be evidence adduced which could reasonably be calculated to resolve the issue presented for determination," which in that case as in this one was a rate increase. *Utah Dep't of Bus. Regulation v. Pub. Serv. Comm'n,* 614 P.2d 1242, 1245 (Utah 1980). The utility bears the burden of presenting the evidence necessary to support the Commission's "essential finding[s]":

"In the regulation of public utilities by governmental authority, a fundamental principle is: the burden rests heavily upon a utility to prove it is entitled to rate relief and not upon the Commission, the Commission staff, or any interested party or protestant, to prove the contrary." *Id.* The Commission "is entitled to know and before it can act advisedly must be informed of all relevant facts," otherwise, "it could not effectively determine whether a proposed rate was justified." *Id.* at 1246. The utility must therefore put forth substantial evidence to establish that its proposed increase is "just and reasonable." *Id.* at 1245–46. The Commission, in turn, bears responsibility for holding the utility to its burden.

¶ 15 Here, the Commission focused on its determination that Questar Gas's decision to construct and operate the $CO_2$ plant "yielded the required result" by protecting customer safety. *In re Questar Gas,* 203 P.U.R.4th 356 at 35, 2000 WL 1451221 (Utah 2000). Therefore, the Commission reasoned, $CO_2$ plant costs "can be legitimately recovered in rates." *Id.* The $CO_2$ Stipulation, the Commission ruled, was a "fair and reasonable settlement of the cost recovery issue" even though there was "[in]sufficient record support to suggest the probable outcome had the case gone to FERC." *Id.* at 35–36. This analysis fails to hold Questar Gas to its burden of proof. By accepting the $CO_2$ Stipulation with no consideration of the prudence of the underlying source of the new costs (i.e., the contract between Questar Gas and its affiliate Questar Pipeline), the Commission abdicated its responsibility to find the necessary substantial evidence in support of the proposed rate increase in the record. We are far from certain, moreover, that the Commission could conceivably determine whether a rate increase is just and reasonable without examining whether the underlying cost-incurring activity was reasonable, which in turn seems to require some attention to the utility's decisionmaking process, most particularly where negotiations with an

---

8.  Alternatively, if Questar Pipeline had received a determination of the proper cost allocation from FERC, and if the Commission had accepted it, such a determination would likely have constitut-

ed a fair and rational basis for departing from the Commission's regular prudence review requirement.

affiliate are involved. Questar Gas's decision not to seek a cost allocation determination from FERC, given the possibility that FERC might have imposed the entire cost on producers rather than on ratepayers, raises further questions regarding the utility's fidelity to its obligations to its customers. *See Utah Dep't of Admin. Servs. v. Pub. Serv. Comm'n*, 658 P.2d 601, 618 (Utah 1983) (stating that a utility's "monopoly position" imposes upon it a "consequent duty to operate in such manner as to give to the consumers the most favorable rate reasonably possible," and that this obligation is reflected in the statutory "just and reasonable" requirement (internal quotation marks omitted)). While the Commission correctly recognized Questar Gas's obligation to ensure the safety of its customers, it incorrectly concluded that this factor provides a near-automatic justification for a rate increase regardless of how the initial threat to safety arose or how the utility sought to alleviate it.

## CONCLUSION

¶ 16 We reverse the Commission's order and reject the rate increase proposed by the $CO_2$ Stipulation.

¶ 17 Associate Chief Justice DURRANT, Justice PARRISH, Justice NEHRING, and Judge NOEL concur in Chief Justice DURHAM's opinion.

¶ 18 Having recused himself, Justice WILKINS does not participate herein; Third District Judge FRANK NOEL sat.