See also 75 P.3d 481, 34 P.3d 218.

2007 UT 79

**In the Matter of the Application of QUESTAR GAS COMPANY to Adjust Rates for Natural Gas Service in Utah.**

**Roger Ball, Claire Geddes, Bud Allen, Madonna Allen, Sue Ashdown, Carol Bee, et al., Petitioners,**

**v.**

**Public Service Commission, Questar Gas Company, the Committee for Consumer Services, and the Division of Public Utilities, Respondents.**

Nos. 20060279, 20060280.

Supreme Court of Utah.

Oct. 12, 2007.

Rehearing Denied Jan. 4, 2008.

Janet I. Jenson, Salt Lake City, for petitioners.

Mark L. Shurtleff, Att'y Gen., Michael L. Ginsberg, Patricia E. Schmid, Reed T. Warnick, Paul H. Proctor, Asst. Att'ys Gen., Sander J. Mooy, Salt Lake City, for Public Service Commission, Committee for Consumer Services, Division of Public Utilities.

C. Scott Brown, Colleen Larkin Bell, Gregory B. Monson, Richard R. Hall, Salt Lake City, for Questar Gas Co.

DURRANT, Justice:

## INTRODUCTION

¶ 1 The Petitioners, including Roger Ball and Claire Geddes, seek review of two orders entered by the Utah Public Service Commission (the "Commission"). The first order denied Ball and Geddes's request to intervene in the Commission's proceedings involving Questar Gas Company's ("Questar") application to recover some of the costs of operating a carbon dioxide ("$CO_2$") processing plant. The second order approved a Gas Management Cost Stipulation (the "Stipulation") entered into by Questar, the Committee for Consumer Services ("Consumer Services"), and the Division of Public Utilities (the "Division") that allows partial recovery for a limited time of Questar's $CO_2$ processing costs. We now affirm the Commission's first order and dismiss the petition for review as to the second order.

## BACKGROUND

¶ 2 This is the third time we have addressed issues relating to the recovery of gas management and $CO_2$ processing costs in-

curred by Questar and its affiliates.[1] We quote liberally from these previous cases in reciting the facts relevant to this case.

## I. QUESTAR I

¶ 3 In 1998, Questar, a regulated public utility, entered into a contract with its unregulated affiliate, Questar Pipeline, to construct a processing plant that would reduce the $CO_2$ in coal seam gas, otherwise known as coal bed methane ("CBM").[2] Questar Pipeline was transporting CBM in steadily increasing quantities and needed the $CO_2$ processing plant to address safety risks to Questar customers.[3] CBM has a low heat content that cannot be used safely in most homes unless special adjustments are made to appliances or $CO_2$ is first removed from the gas at a processing facility.

¶ 4 On November 25, 1998, Questar submitted an application to the Commission for approval of the contract and requested authorization to transfer the costs of constructing and operating the $CO_2$ plant directly to ratepayers.[4] In its December 3, 1999 order, the Commission denied Questar's request on the basis that these costs were not the kind of expenses allowed under Utah Code section 54–7–12(3)(d)(i), which is known as the pass-through statute.[5] The Commission also noted that Questar bears the burden of establishing the prudence of its contract with Questar Pipeline because of their affiliate relationship.[6] The Commission did not address whether Questar's decision to enter into the contract with Questar Pipeline was prudent; rather, the Commission determined that, even assuming the prudence of the contract and the reasonableness of its terms, Questar had failed to present substantial evidence that the resulting rates would be just and reasonable.[7]

¶ 5 In *Questar Gas Company v. Public Service Commission (Questar I)*, we set aside the Commission's December 3, 1999 order, holding that Questar's ability to recover costs was not limited to the pass-through statute.[8] We based our decision on the Commission's own prior practice, noting that the Commission, when reviewing past requests for cost recovery, determined whether the resulting rates were "just, reasonable and cost justified" and whether their approval was "in the public interest."[9] Also, based on the Commission's finding "that it was impossible to make a [prudence] determination because the record was insufficient and could not be created," we limited our holding to the question of the procedure Questar should have followed to recover processing costs incurred between June 1999 and August 2000.[10] We remanded the case to the Commission for further consideration in accordance with the appropriate cost recovery procedure.[11]

## II. QUESTAR II

¶ 6 On December 17, 1999, over a year before we issued *Questar I*, Questar filed a general rate proceeding with the Commission, which included a request under Utah Code section 54–7–12(3)(a) for interim rate relief of over $7 million annually to cover the $CO_2$ plant operating costs.[12] Questar did not, however, seek approval of its contract with Questar Pipeline.[13] The Commission held a hearing to consider this request for interim rate relief and granted the request on Janu-

1. *See Comm. of Consumer Servs. v. Pub. Serv. Comm'n (Questar II)*, 2003 UT 29, 75 P.3d 481; *Questar Gas Co. v. Utah Pub. Serv. Comm'n (Questar I)*, 2001 UT 93, 34 P.3d 218.

2. *See Questar II*, 2003 UT 29, ¶ 2, 75 P.3d 481.

3. *Id.*

4. *Id.*

5. *Id.*

6. *Id.*

7. *Id.*

8. *Questar I*, 2001 UT 93, ¶ 19, 34 P.3d 218.

9. *Questar II*, 2003 UT 29, ¶ 3, 75 P.3d 481.

10. *Id.* ¶ 3 n. 4 (alteration in original).

11. *Questar I*, 2001 UT 93, ¶ 20, 34 P.3d 218.

12. *Questar II*, 2003 UT 29, ¶ 4, 75 P.3d 481.

13. *Id.*

ary 25, 2000.[14] Consumer Services petitioned the Commission for rehearing regarding the interim rate increase, arguing that the increase was not legally proper, factually supported, or in the public interest.[15] By declining to respond to Consumer Services' request, the Commission affirmed its January 25 order.[16]

¶ 7 On June 2, 2000, Questar and the Division filed a stipulation that resolved between them the issues of cost recovery and ratemaking treatment of gas processing costs and provided that annual $CO_2$ plant costs in the amount of $5 million should be passed on to ratepayers.[17] Although Consumer Services objected to the cost recovery stipulation, the Commission approved the stipulation on August 11, 2000.[18]

¶ 8 In approving Questar's cost recovery, the Commission determined that it need not rule on whether Questar's decision to contract with its affiliate Questar Pipeline was prudent.[19] The Commission acknowledged that Questar's prudence in this matter remained "the most troubling question" and that the burden to demonstrate prudence was on Questar.[20] But the Commission relied on a "safety exception" to excuse Questar from its burden to demonstrate the prudence of its contract and $CO_2$ processing costs.[21] The Commission determined that "once coal seam gas became a persistent threat to the [heat level] of [Questar's] gas supply, customer safety was threatened and an effective response was mandatory."[22] The Commission reasoned that it could decide the legitimacy of recovering $CO_2$ plant processing costs from ratepayers without determining whether the underlying affiliate contract was prudent because Questar had not specifically applied for a decision on the affiliate issue.[23] The Commission then ac-

cepted the argument that $5 million per year, or 68 percent of the costs of $CO_2$ processing, represented a "fair and reasonable settlement of the cost recovery issue."[24]

¶ 9 In *Committee of Consumer Services v. Public Service Commission (Questar II)*, we held that the Commission had abused its discretion by failing to follow its established practice of requiring a prudence review of rate increases and affiliate transactions.[25] We stated that by approving the cost-recovery stipulation without considering the prudence of the underlying source of the costs— the contract between Questar and Questar Pipeline—the Commission had abdicated its responsibility to find the necessary substantial evidence in the record in support of the proposed rate increase.[26] We did not determine, however, whether Questar was prudent in entering the affiliate contract and incurring the $CO_2$ processing costs.

¶ 10 On remand, the Commission found in an August 30, 2004 order (the "2004 Order") that Questar had failed to meet its burden of proving the prudence of its rate increase and affiliate transaction. As a result, the Commission barred the cost recovery that Questar sought during the period from June 1999 to May 2004. The Commission also found that Questar's actions did not produce any unique economic benefits to Utah ratepayers justifying a cost recovery. By its own terms, however, the 2004 Order did not foreclose the issue of whether Questar could seek recovery of future $CO_2$ processing costs. Indeed, the 2004 Order anticipated opening another docket to develop a long-term plan to deal with the hazards of CBM and Questar's obligation to provide safe and cost-effective services to its customers. This plan was further supported by the Commission's Octo-

14. *Id.*

15. *Id.*

16. *Id.*

17. *Id.*

18. *Id.*

19. *Id.* ¶ 5.

20. *Id.*

21. *Id.* ¶ 12.

22. *Id.* ¶ 5.

23. *Id.*

24. *Id.*

25. *Id.* ¶ 13.

26. *Id.* ¶ 15.

ber 20, 2004 order (the "Clarification Order"), which stated that the 2004 Order "does not preclude Questar from seeking recovery of $CO_2$ processing costs in other dockets." The Clarification Order merely reiterated that any future cost recovery would be subject to the appropriate prudence review.

## III. QUESTAR'S APPLICATION FOR FUTURE COST RECOVERY

¶ 11 As contemplated in the 2004 Order, the Commission opened a new docket and Questar explored a long-term plan to deal with CBM issues. Between October 2004 and January 2005, Questar explored at least fourteen options to deal with CBM, including those recommended by Consumer Services and the Division. During that time, Questar conducted six technical conferences, examining both the cost and the efficiency of the various alternatives. By January 31, 2005, Questar had narrowed down the preferable alternatives for dealing with CBM to $CO_2$ removal and precision blending of gas streams. In the short term, these two alternatives were essentially identical; however, if Questar's $CO_2$ plant were operated year round and used to process third-party gas, Questar could generate revenue from the third-party processing to offset other $CO_2$ processing costs and reduce the costs passed on to ratepayers. As a result, Questar concluded that continued operation of the $CO_2$ plant would provide the most prudent and cost-effective outcome. On January 31, 2005, Questar filed an application with the Commission seeking future recovery of $CO_2$ processing costs beginning February 1, 2005.

## IV. THE STIPULATION

¶ 12 After Questar's application for future cost recovery, the Commission gave notice of a conference to schedule further proceedings. On March 1, 2005, the parties agreed on a schedule in which Questar would file testimony on April 15 supporting the prudence of its ongoing gas management costs, and Consumer Services, the Division, and any intervenor would file responsive testimony on August 15. The subsequent hearings were scheduled for October 2005.

¶ 13 Questar filed extensive sworn testimony in support of its application for cost recovery. Consumer Services and the Division conducted extensive discovery both prior to and following this filing, retaining independent experts to evaluate the prudence of Questar's gas management costs. In all, Questar filed testimony of six witnesses, consisting of 206 pages of testimony and forty-five exhibits, while Consumer Services and the Division served over four hundred discovery requests that resulted in the production of nearly one thousand pages of studies and information. During discovery, Consumer Services and the Division requested an extension of their August 15 testimony filing date, in part because they were involved in settlement discussions with Questar based on the information provided in the testimony and discovery. Finally, after months of negotiation, Questar, Consumer Services, and the Division reached a settlement agreement on October 11, 2005, memorialized in the Stipulation.

¶ 14 In the Stipulation, Consumer Services and the Division agreed that Questar should be granted future cost recovery. The parties agreed that Questar is legally obligated to provide safe and reliable gas service to its customers. The parties agreed that Questar must manage the heat content of its gas supply to allow customers a transition period in which their appliances can be inspected and, if necessary, adjusted for the different composition of gas that will enter Questar's system once that transition period is over. The parties agreed that the operation of the $CO_2$ removal plant is a reasonable means of accomplishing the necessary heat-content management. Finally, the parties agreed that approval of the Stipulation is in the public interest, is consistent with just and reasonable rates, and will help ensure customer safety.

¶ 15 The Commission set October 20, 2005, for a hearing where it would hear testimony favoring or opposing the Stipulation from the parties and the public at large. The Commission delivered proper notice of the hearing on October 11, 2005.

¶ 16 At the hearing, representatives from Questar, Consumer Services, and the Divi-

sion testified. Dr. William Powell testified that the Division had conducted its own analysis of the available alternatives and concluded that operating the $CO_2$ processing plant was a reasonable course of action until customer appliances are compatible with the lower heat content of the natural gas. On behalf of Consumer Services, Dan Gimble testified that the circumstances concerning the supply of CBM had changed from prior dockets when Consumer Services opposed Questar's cost recovery. Consumer Services had previously argued that CBM provided little benefit to ratepayers. But Gimble stated that, as of October 2005, CBM was a significant and beneficial gas supply to Questar's customers. And on behalf of Questar, Barrie McKay testified that Questar had engaged in vigorous negotiations with Consumer Services and the Division, which included independent experts, responses to discovery requests, and more than one thousand pages of studies relating to gas processing alternatives. Finally, two members of the public were present at the public portion of the hearing, one of whom was not a familiar participant at Commission proceedings.

¶ 17 On November 4, 2005, Ball and Geddes filed affidavits opposing the Stipulation. Ball was the former staff director of Consumer Services, and he had participated in that capacity in the Commission proceedings through January 2005, when his employment was terminated. After leaving Consumer Services, Ball was notably absent from Commission proceedings until November 17, 2005, when he and Geddes filed their formal Request to Intervene before the Commission with the support of various individuals identifying themselves as Questar customers.

## V. THE COMMISSION'S ORDER DENYING THE REQUEST TO INTERVENE

¶ 18 On January 6, 2006, the Commission issued its Order on Request to Intervene (the "Intervention Order"), denying Ball and Geddes formal intervention in the proceedings. In the Intervention Order, the Commission noted that both Ball and Geddes were familiar with the proceedings and, had they wanted to intervene, they should have done so in

a more timely manner. The Commission stated, "We will not give them reprieve from the consequences of their own choices." The Commission further noted that allowing their late intervention would "set[ ] precedent for seeking intervention after the normal conclusion of the administrative process."

¶ 19 The Commission also explained that Ball and Geddes's interest as consumers was protected because the "Division and [Consumer Services] are statutorily charged with including customers' interest in their deliberations and advocacy" under Utah Code sections 54-4a-6 and 54-10-4. The Commission noted that "[b]oth entities thoroughly studied the issues in this matter, carefully scrutinized [Questar's] proposals and analysis, and fulfilled their statutory responsibilities." Indeed, the Commission found that "the Division and [Consumer Services] obtained significant concessions and compromises from Questar."

¶ 20 The Commission ultimately indicated that allowing the intervention would violate Utah Code section 63-46b-9: "[I]t is not appropriate for [Ball and Geddes] to be granted such a tardy intervention and eviscerate the work already done and subject all parties, the regulatory process, the State's and customers' interests, to the vagaries of the odyssey foreshadowed in [their] intervention."

## VI. THE COMMISSION'S ORDER APPROVING THE GAS MANAGEMENT COST STIPULATION

¶ 21 On June 6, 2006, the Commission entered its Report and Order (the "Approval Order") approving the Stipulation. In the Approval Order, the Commission noted Consumer Services' change of position with respect to Questar's recovery of $CO_2$ processing costs. The Commission stated that CBM now represents between twenty-five percent and forty percent of Questar's overall market purchases as compared to less than five percent during Consumer Services' previous opposition to Questar's cost recovery. In addition, Consumer Services' experts concluded that special blending of CBM would "not entirely eliminate the need to process the gas in order to protect Questar Gas Customers."

As a result, Consumer Services concluded that $CO_2$ removal is the most effective way to deal with the CBM supply.

¶ 22 In the Approval Order, the Commission primarily found as follows: (1) there had been a significant change of circumstances such that now "customers have benefitted financially from the presence of [CBM] on the Questar gas system"; (2) Questar met its burden of proving the prudence of its decision to pursue $CO_2$ processing after its technical conferences, analyses, studies, and testimony, all of which indicated that continued operation of the $CO_2$ plant is the most cost-effective and efficient means of dealing with the CBM supply; and (3) safety, efficiency, and cost considerations, rather than affiliate interests, led all of the parties to conclude that operation of the $CO_2$ plant is the preferred course of action during the stipulated transition period. Finally, the Commission noted that, in reaching the conclusion to continue operating the $CO_2$ plant, Questar "conducted a transparent decision-making process open to the public and subject to scrutiny by any interested person."

## VII. COMMISSION RECONSIDERATION AND JUDICIAL REVIEW

¶ 23 The Petitioners requested that the Commission reconsider both its order denying the request to intervene and its order approving the Stipulation. The Commission never responded to either of these requests, and as a result the requests were deemed denied by statute.[27] The Petitioners filed petitions with this Court to review both orders of the Commission. The petition to review the Commission's Intervention Order was filed by Ball and Geddes, while the petition to review the Commission's Approval Order was filed by all of the Petitioners, including Ball and Geddes. Questar filed motions to dismiss both petitions. We deferred ruling on these motions until the briefing was complete and we heard oral arguments on the matter. We now affirm the Commission's Intervention Order and grant Questar's motion to dismiss the petition for review as to the Approval Order.

## VIII. THE PETITIONERS' AND THE RESPONDENTS' ARGUMENTS

¶ 24 On appeal, the Petitioners offer several reasons why the cost recovery granted in the Approval Order should not be allowed. First, the Petitioners argue that the Approval Order is barred because the 2004 Order is res judicata. The Respondents, which include Questar, Consumer Services, and the Commission, reply that res judicata does not apply because the Commission in the 2004 Order never actually decided that Questar was imprudent, but instead decided that Questar had not established facts sufficient to show prudence. The Respondents also assert that the 2004 Order does not bar cost recovery in the Approval Order because ratemaking is a legislative function of the Commission to which res judicata does not apply. Furthermore, the Respondents argue that there is a material difference in the facts underlying the two orders such that the 2004 Order does not bar recovery under the Approval Order; the 2004 Order by its very terms welcomed and anticipated Questar's seeking recovery of $CO_2$ processing costs when it could demonstrate the prudence of its continued operation of the $CO_2$ plant.

¶ 25 Second, the Petitioners argue that the Commission did not conduct a proper prudence review before entering the Approval Order. The Petitioners maintain that Questar's previous imprudence is still determinative regardless of how the circumstances have changed. The Respondents reply that the Approval Order, finding that Questar's decision to operate the $CO_2$ plant was prudent, need only be supported by substantial evidence, a standard that was met in this case. The Respondents maintain that, as markets develop and facts change, the decision to continue operating the $CO_2$ plant is a separate decision to which prudence should be applied.

¶ 26 Third, the Petitioners argue that if the appropriate standard had been correctly applied, the Commission would have prohibited Questar from contracting with its affiliate,

27. *See* Utah Code Ann. § 54–7–15(2)(c) (Supp. 2007).

Questar Pipeline, to build the $CO_2$ plant.[28] The Respondents reply that affiliate transactions are not absolutely barred but require review by the Commission to assure that customer interests are not being subordinated to those of corporate affiliates.

¶ 27 We do not reach the merits of the various arguments in the Petitioners' petition for review of the Commission's Approval Order but instead dismiss the petition for lack of appellate standing. And we affirm the Commission's Intervention Order denying Ball and Geddes intervention in the Commission proceedings. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(e)(i).

## STANDARD OF REVIEW

¶ 28 The Utah Administrative Procedures Act ("UAPA") governs our review of administrative agency decisions based on formal adjudicative hearings.[29] Section 63–46b–16(4) provides that we grant relief to petitioners only if they were "substantially prejudiced" by any of the following:

(d) the agency has erroneously interpreted or applied the law;

(e) the agency has engaged in an unlawful procedure or decision-making process, or has failed to follow prescribed procedure;

. . .;

(g) the agency action is based upon a determination of fact, made or implied by the agency, that is not supported by substantial evidence when viewed in light of the whole record before the court;

(h) the agency action is:

(i) an abuse of the discretion delegated to the agency by statute;

. . .;

(iii) contrary to the agency's prior practice, unless the agency justifies the inconsistency by giving facts and reasons that demonstrate a fair and rational basis for the inconsistency; or

(iv) otherwise arbitrary or capricious.

## ANALYSIS

¶ 29 Our analysis of appellate standing is dependent on the outcome of our review of the Commission's Intervention Order denying Ball and Geddes's request to intervene. Accordingly, we will first review the Intervention Order and then proceed to our analysis of appellate standing.

## I. REVIEW OF THE COMMISSION'S INTERVENTION ORDER

■ ¶ 30 We review the Commission's Intervention Order denying Ball and Geddes's request to intervene for "substantial evidence" in the record.[30] Because the Commission based its decision on substantial record evidence, its denial of Ball and Geddes's request to intervene was proper.

■ ¶ 31 Section 63–46b–9 of the UAPA governs intervention in Commission proceedings. Section 63–46b–9(2) grants a qualified right to intervene so long as "(a) the petitioner's legal interests may be substantially affected by the formal adjudicative proceeding; and (b) the interests of justice and the orderly and prompt conduct of the adjudicative proceedings will not be materially impaired by allowing the intervention."[31] The Respondents concede that Ball and Geddes may be "substantially affected" by the proceedings. Thus, the only issue is whether Ball and Geddes's intervention meets the second requirement for intervention.

¶ 32 Ball and Geddes rely on our decision in *Millard County v. State Tax Commission*, where we allowed Millard County to intervene in a proceeding before the Utah State Tax Commission (the "Tax Commission").[32] In *Millard County*, Intermountain Power Agency ("IPA") filed a petition for redetermination of its sales and use tax liability with

---

28. *Id.* § 54–4–26 (2000).

29. Utah Code Ann. § 63–46b–16 (2004).

30. Utah Code Ann. § 63–46b–16(4)(g) (2004).

31. *Id.* § 63–46b–16(4)(g); *see Millard County v. State Tax Comm'n*, 823 P.2d 459, 462 (Utah 1991).

32. 823 P.2d 459, 464 (Utah 1991).

the Tax Commission in May 1988.[33] One month after IPA filed its petition, Millard County ("the County") petitioned to intervene in the proceeding since it was a significant beneficiary of the taxes paid by IPA.[34] The Tax Commission and IPA subsequently settled and stipulated to IPA's tax liability in August 1988.[35] As a result of this settlement, the Tax Commission in February 1989 denied Millard County's petition to intervene.[36] We reversed and held that the Tax Commission erred in denying the County intervention because the County had legal interests that would be substantially affected by the proceeding.[37] Moreover, the County's intervention was filed after only one month of proceedings and therefore would not have disrupted the minimal work completed by the parties up to that point.[38]

¶ 33 Unlike Millard County's timely petition, Ball and Geddes's request to intervene will materially impair the interests of justice and the orderly and prompt conduct of the Commission proceedings. Ball and Geddes filed their request to intervene in this case over a year after the parties initiated proceedings and after the parties entered into a settlement agreement. Beginning in October 2004 and prior to Ball and Geddes's attempted intervention in November 2005, the parties undertook much work at great expense. The parties engaged in vigorous negotiations and retained independent experts to make assessments of the best alternatives to deal with the CBM supply. Moreover, Questar provided lengthy testimony and responded to over four hundred discovery requests made by Consumer Services and the Division that comprised over one thousand pages. Ball and Geddes's failure to intervene earlier was not for lack of knowledge or notice of the proceedings; indeed, Ball originally participated in the proceedings as a staff director for Consumer Services. As staff director, Ball was aware of the six technical conferences conducted by Questar, as well as the initial recommendations made by Consumer

Services and the Division. By January 2005, Ball knew that Questar had narrowed down the preferable alternatives for dealing with CBM to $CO_2$ removal or precision blending of gas streams.

¶ 34 The Stipulation in this case was not used to prevent another party from participating in the proceedings, as in *Millard County*,[39] but was entered into before Ball and Geddes attempted to intervene. Furthermore, Ball and Geddes's request to intervene came after they failed to participate in the public hearings that were conducted to receive testimony favoring or opposing the Stipulation. Although Ball and Geddes argue that the Commission failed to give adequate notice of the hearing, the record indicates that the Commission followed all UAPA guidelines for providing notice. Indeed, two nonparties received notice of the proceedings and participated in the hearing, including one individual who was not a regular participant in Commission proceedings.

¶ 35 Finally, in *Millard County*, the County did not have its interests adequately represented by another party in the proceedings, whereas Ball and Geddes's interests as consumers in this case were protected by Consumer Services and the Division—both charged by statute with protecting consumer interests. Consumer Services indicated at the Stipulation hearing that the market for CBM had undergone a material change and had become a significant source of gas, providing substantial benefits to consumers. According to Consumer Services, because of this change in market conditions, the Stipulation would financially benefit Questar's customers.

¶ 36 Ball and Geddes do not provide any reasonable explanation for their late intervention. They argue that up until their request to intervene, they had relied on Consumer Services to represent their interests as consumers, but at the moment Consumer

33. *Id.* at 460.

34. *Id.*

35. *Id.*

36. *Id.*

37. *Id.* at 462.

38. *Id.* at 463.

39. *See id.* at 461.

Services agreed to the Stipulation, it abandoned the interests of consumers and yielded to the desires of Questar. Were we to follow Ball and Geddes's reasoning, a party would need to disagree only with the direction of the proceedings to be justified in intervening, no matter how late in the game. Such reasoning is misguided because it ignores the plain language of section 63–46b–9, which requires that intervention not materially interfere with the interests of justice and the orderly and prompt adjudication of the matter before the Commission.[40]

¶ 37 Ultimately, Ball and Geddes's intervention contemplates undoing all of the Commission proceedings in order to subject to their scrutiny and cross-examination. Clearly, at this late stage, such action would materially impair the proceedings because it would require all the parties to duplicate expenditures of time and money to accommodate a party who was well aware of the proceedings and yet decided to postpone intervention. Therefore, the Commission properly denied Ball and Geddes's request to intervene.

¶ 38 In addition to affirming the Commission's Intervention Order, we briefly discuss two additional bases for upholding the Commission's order. First, Ball and Geddes failed to substantially marshal the evidence as required when contesting a factual finding of the Commission. Second, Ball and Geddes failed to meet the briefing requirements of rule 24 of the Utah Rules of Appellate Procedure.

### A. Failure to Substantially Marshal the Evidence

¶ 39 A party is required to marshal the evidence supporting the Commission's factual findings and to show that, "despite the supporting facts, and in light of conflicting or contradictory evidence, the findings are not supported by substantial evidence."[41] In this case, Ball and Geddes failed to substantially marshal the evidence in support of the Commission's finding regarding intervention. Instead, they advocated their position by merely arguing that it is just and equitable for them to intervene in the proceedings. Their failure to marshal the evidence is a sufficient basis for affirmance of the Intervention Order.[42]

### B. Failure to Adequately Brief

¶ 40 Additionally, Ball and Geddes's briefing on the issue of intervention is inadequate. Under rule 24 of the Utah Rules of Appellate Procedure, petitioners seeking judicial review must identify the legal or factual errors of the lower court or agency.[43] We have consistently declined to review issues that are not adequately briefed.[44] And we have long held that it is improper to "mak[e] blanket assertions and leav[e] the responsibility to the court to ferret out evidence from the record to support [them]."[45] In this case, Ball and Geddes's "overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court."[46]

40. Utah Code Ann. § 63–46b–9(2)(b).

41. *Grace Drilling Co. v. Bd. of Review of Indus. Comm'n*, 776 P.2d 63, 68 (Utah Ct.App.1989); *see also Associated Gen. Contractors v. Bd. of Oil, Gas & Mining*, 2001 UT 112, ¶ 21, 38 P.3d 291; *EAGALA, Inc. v. Dep't of Workforce Servs.*, 2007 UT App 43, ¶ 8, 157 P.3d 334.

42. *See Wayment v. Howard*, 2006 UT 56, ¶ 9, 144 P.3d 1147.

43. Utah R.App. P. 24(a)(9) ("The argument shall contain the contentions and reasons of the appellant with respect to the issues presented, including the grounds for reviewing any issue not preserved in the trial court, with citations to the authorities, statutes, and parts of the record relied on.").

44. *See State v. Thomas*, 961 P.2d 299, 304 (Utah 1998) ("[A] reviewing court will not address arguments that are not adequately briefed."); *see also W. Jordan City v. Goodman*, 2006 UT 27, ¶ 29, 135 P.3d 874 (stating that the "court is not a depository in which the appealing party may dump the burden of argument and research" (citations and internal quotation marks omitted)).

45. *Lake Shore Motor Coach Lines, Inc. v. Bennett*, 8 Utah 2d 293, 333 P.2d 1061, 1064 (1958).

46. *Bearden v. Wardley Corp.*, 2003 UT App 171, ¶ 8 n. 4, 72 P.3d 144 (citation and internal quotation marks omitted).

¶ 41 After the Commission denied their request to intervene, Ball and Geddes submitted a request for reconsideration to the Commission. In their brief for reconsideration, Ball and Geddes failed to raise or even identify a single error that would have required the Commission to modify its Intervention Order. Rather, Ball and Geddes incorporated by reference the brief they had previously filed with the Commission on December 13, 2005, which included arguments as to reasons the Commission should grant the intervention. Thus, Ball and Geddes essentially asked the Commission to review the previous brief and find some reason to change its Intervention Order.

¶ 42 In its motion to dismiss, Questar highlights this inadequate briefing before the Commission. Questar argues that because Ball and Geddes did not raise any issues of error in their request for reconsideration, they did not preserve any issues for our review. Indeed, Utah Code section 54–7–15 states that "[a]n applicant [for reconsideration] may not urge or rely on any ground not set forth in the application in an appeal to any court." [47]

¶ 43 Furthermore, like their request for reconsideration, Ball and Geddes's memorandum opposing summary dismissal of their appeal consists of a single page and does not identify specific issues of error but merely incorporates by reference the same December 13, 2005 brief. Their memorandum further states in reference to that brief that "these pleadings, seeking reconsideration, speak for themselves and show the Court that these Petitioners have raised arguments of substantial merit, warranting review in this Court." Ultimately, Ball and Geddes's petition before us amounts to a request that we review their initial request for intervention and find some merit in that argument. Even under a de novo standard of review, such briefing would be inadequate. But here, where we give deference to the Commission's decision and review for "substantial evidence" in the record, asking us to review the arguments and facts originally submitted to the Commission is clearly inappropriate. Accordingly, had we so chosen, we could have avoided addressing the intervention issue as a result of inadequate briefing.

## II. PETITIONERS' APPELLATE STANDING

 ¶ 44 Generally, a party lacks appellate standing when the party is denied intervention in a proceeding and therefore is unable to participate below. This is a corollary to the exhaustion of remedies requirement that must be satisfied in order to appeal a Commission decision.[48] In this case, however, our appellate standing analysis does not end with affirming the Commission's decision to deny Ball and Geddes intervention in the proceedings. Utah Code section 54–7–15 grants standing to certain classes of individuals to seek judicial review of Commission decisions regarding public utilities. Nevertheless, such individuals are not given standing to appeal any Commission decision, but must also be "aggrieved" or "substantially prejudiced" by that decision.[49] Thus, we must now determine whether any individual petitioner in this case has appellate standing to seek judicial review of the Commission's orders.

### A. Statutory Standing Requirements

 ¶ 45 As we have stated, "Prior to deciding the substantive questions presented by the parties, this Court must ascertain whether it has subject matter jurisdiction over the petitions and the appeal before it." [50] In this case, three sections of the Utah Code are relevant in determining whether any individuals have appellate standing that would grant this court subject matter jurisdiction to hear their appeal: (1) section 54–7–15, (2) section 63–46b–14, and (3) section 63–46b–16. Read together, these three sections provide the basis for our standing analysis.

47. Utah Code Ann. § 54–7–15(2)(b) (Supp.2007).

48. *Id.* § 63–46b–14(3) (2004) ("A party may seek judicial review only after exhausting all administrative remedies available. . . .").

49. *Id.* §§ 63–46b–14(1), –16(4).

50. *Williams v. Pub. Serv. Comm'n,* 754 P.2d 41, 46 (Utah 1988).

¶ 46 First, section 54–7–15 of the Public Utilities Act ("PUA") identifies the individuals who are allowed to seek judicial review of a Commission decision. Section 54–7–15(1) states as follows: "Before seeking judicial review of the commission's action, *any party, stockholder, bondholder, or other person pecuniarily interested in the public utility* who is dissatisfied with an order of the commission shall meet the requirements of this section." [51]

¶ 47 Second, section 63–46b–14 of the UAPA, which governs state administrative agency proceedings, requires individuals to exhaust all administrative remedies before they will be allowed to seek judicial review of an agency decision.[52] This includes applying for a rehearing with the Commission.[53] The UAPA also reflects the traditional notion that a party may appeal only an adverse judgment.[54]

██ ¶ 48 Third, section 63–46b–16(4) echoes the "aggrievement" requirement of section 63–46b–14 by using a synonymous term, stating as follows: "The appellate court shall grant relief only if, on the basis of the agency's record, it determines that a person seeking judicial review has been *substantially prejudiced* ...." [55] Thus, if an agency decision has not "substantially prejudiced" the appealing party, the party has no appellate standing.

██ ¶ 49 In sum, an individual may have appellate standing to seek judicial review of an agency decision if he or she has exhausted all administrative remedies and qualifies as an "aggrieved" or "substantially prejudiced" "party, stockholder, bondholder, or other person pecuniarily interested in the public utility."

¶ 50 The exhaustion of administrative remedies is not at issue here, since the Petitioners sought rehearing before the Commission on both the Intervention Order and the Ap-

proval Order. Further, while none of the Petitioners were parties to the proceedings below,[56] (indeed only Ball and Geddes petitioned the Commission to intervene and their request was denied) some of the Petitioners are ratepayers or stockholders of Questar. We therefore are left to consider whether those petitioners who qualify as nonparty (1) ratepayers or (2) stockholders have appellate standing. We conclude that the ratepayers do not have standing because they are not "pecuniarily interested in the public utility." And while the stockholders are among an authorized class of persons who have standing, they are not "aggrieved" or "substantially prejudiced" by the Commission's decision and therefore have no appellate standing.

### B. Ratepayer Standing

¶ 51 We first note that ratepayers who were parties to the proceedings below may have appellate standing in a given case if they exhaust all administrative remedies and are aggrieved by the Commission's decision. But in this case, where none of the Petitioners were parties to the action below, the Petitioners argue that ratepayers have appellate standing because they qualify as "pecuniarily interested in the public utility" and are "aggrieved" by the Commission's decision to approve Questar's cost recovery. There is no dispute among the parties that the ratepayers are adversely affected in the short term by the Commission's decision. In fact, Questar concedes that their cost recovery will result in an approximate $0.50 increase per month in a ratepayer's gas bill until the stipulated transition period is completed as planned in 2008. Differences arise, however, in the parties' interpretation of the term "pecuniarily interested in the public utility."

¶ 52 According to the Petitioners, a pecuniary interest in the public utility means having some kind of financial interest related to the public utility. So the Petitioners argue

---

51. Utah Code Ann. § 54–7–15(1) (Supp.2007) (emphasis added).

52. *Id.* § 63–46b–14(2) (2004).

53. *Id.* § 54–7–15(2)(a) (Supp.2007).

54. *Id.* § 63–46b–14(1) (2004).

55. *Id.* § 63–46b–16(4) (emphasis added).

56. Roger Ball did participate in some of the lower proceedings as staff director of Consumer Services but not in his current capacity as an individual ratepayer.

that because ratepayers are financially affected by Questar's cost recovery, ratepayers qualify as "pecuniarily interested in the public utility" and therefore have standing to appeal the Commission's decision.

¶ 53 On the other hand, the Respondents argue that having a pecuniary interest in the public utility means having a direct financial stake in the public utility, such as that of a stockholder, rather than having a financial relation to the public utility, such as that of a ratepayer. We agree.

¶ 54 First, under the doctrine of ejusdem generis, ratepayers simply do not qualify as persons "pecuniarily interested in the public utility" by the very terms of the statute.[57] The term "pecuniarily interested in the public utility" must be interpreted as a class consistent with the terms "stockholder" and "bondholder." "[Ejusdem generis] declares that in order to give meaning to the general term, the general term is understood as restricted to include things of the same kind, class, character, or nature as those specifically enumerated, unless there is something to show a contrary intent."[58] The statute first speaks in terms of "stockholders" and "bondholders," individuals that have a specific financial stake in the public utility, whether it be equity or debt. A ratepayer, although financially affected in the sense of paying higher or lower rates as a consumer, does not have a stake in the public utility akin to a stockholder or bondholder and therefore does not qualify as a "person pecuniarily interested in the public utility." Furthermore, a ratepayer's financial interest is in direct opposition to that of stockholders and bondholders and therefore inconsistent with a pecuniary interest in the public utility. Indeed, ratepayers want low rates, while stockholders generally want greater revenues, and as a result, higher rates. It would be nonsensical to interpret "ratepayers" as

falling within the same class of persons as "stockholders" when the interests of the two classes are opposed to each other.[59]

¶ 55 Second, we note the complete absence of the term "ratepayer" or "customer" in this section of the statute. The Legislature was well aware of these terms as evidenced by their frequent use in the PUA, yet the terms are notably absent from section 54–7–15.[60]

¶ 56 Third, sections 54–1–11 and 54–4a–5 of the PUA support our interpretation of the term "pecuniarily interested in the public utility." Section 54–1–11(1)(a) states that "[n]o person employed as a commissioner or as personnel of the commission shall, while so employed ... [h]ave any pecuniary interest, whether as the holder of stock or other securities ... [of] any public utility." Similarly, section 54–4a–5(1) states that "[n]o employee of the Division of Public Utilities shall, while so employed ... have any pecuniary interest, whether as the holder of stock or other securities ... [of] any public utility."[61] Thus, consistent with these sections, a commissioner or employee with a "pecuniary interest" is one who holds "stock or other securities" of a public utility, not a mere ratepayer, a category that would presumably include all commissioners.

¶ 57 Ultimately, although the ratepayers are "aggrieved" by the increase to their gas bill resulting from the Commission's decision, they lack appellate standing because they have no pecuniary interest in the public utility and therefore do not fall within the classes of persons to whom standing is granted. We now turn to the remaining three petitioners who have provided stock certificates to verify their status as Questar stockholders.

### C. Stockholder Standing

¶ 58 Of the many petitioners in this case, only three are Questar stockholders. As

---

57. Utah Code Ann. § 54–7–15(1) (Supp.2007).

58. *State ex rel. A.T.,* 2001 UT 82, ¶ 12, 34 P.3d 228.

59. Even the Petitioners recognize the opposing nature of the two classes as they seek to have stockholders, not ratepayers, bear the cost of operating the $CO_2$ processing plant.

60. The Utah Code references either the term "customer" or the term "ratepayer" six times. Utah Code Ann. §§ 54–2–1(15)(e) (Supp.2007), 54–3–1 (2000), 54–4–4(4)(a)(i) (Supp.2007), 54–4–14 (2000), 54–4–25(5)(a) (Supp.2007), 54–4a–6(4)(d) (2000).

61. *See also id.* § 54–1–11(1)(a) (2000).

stockholders, these individuals are explicitly granted the right to seek judicial review under the PUA.[62] Unlike the ratepayers, however, the stockholders lack appellate standing in this case because they are not "aggrieved" or "substantially prejudiced" by the Commission's decision.

¶ 59 In *Utah Chapter of the Sierra Club v. Utah Air Quality Board*, we held that standing requires a showing of injury, causation, and redressability.[63] And we have stated that the term "aggrieved" connotes nothing more than a showing of injury, "the traditional principle that claimants 'must be able to show that [they have] suffered some distinct and palpable injury that gives [them] a personal stake in the outcome of the legal dispute.' "[64] In this case, the stockholders fail to assert a proper injury to meet the first element of the traditional test; therefore, a full analysis of standing is unnecessary.

¶ 60 The Petitioners' brief does not provide much by way of argument as to how the Questar stockholders have been injured in that capacity by the Commission's decision. Although the Petitioners' brief inadequately addresses the stockholders' injury, the stockholders set forth in personal affidavits a claim that they may be adversely affected in the long term by Questar's self-dealing transaction with Questar Pipeline, which enabled the $CO_2$ plant to be built. The stockholders allege that approving the Stipulation will encourage Questar to continue affiliate transactions and will lead stockholders to suffer a fate comparable to the stockholders of Enron, WorldCom, or Tyco. But the stockholders fail to assert any injury similar to the economic injury alleged by the ratepayers. In fact, the Petitioners' brief indicates that Questar stockholders have benefitted from the improved financial situation that resulted from the Commission's approval of the cost recovery. Furthermore, the stockholders do not assert that their alleged injury is immi-

nent. Rather, their alleged injury is one that *might* take place sometime in the future. In short, stockholders may have appellate standing where the Commission's decision substantially prejudices the interests of those stockholders, but such is not the case here.

¶ 61 Protecting stockholders from corporate mismanagement does not fall within the "zone of interest" contemplated by section 54-7-15. A person who is "aggrieved" by agency action must establish "that the injury he complains of ... falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint."[65] The Public Utilities Act was created to regulate utilities, not to protect stockholders from mismanagement. Stockholders are given other means to deal with such matters. Indeed, the Petitioners recognized before the Commission the stockholders' ultimate remedy when dealing with corporate mismanagement. The Petitioners' stated that, unlike ratepayers,

> [i]f the Questar shareholders believe that their company's executives have injured their interests by wrongheaded business decisions, they have a choice—they can seek redress through the corporate oversight shareholders have always had with respect to management functions or they can sell their shares and invest in better operated companies.

¶ 62 In sum, the ratepayers may have suffered a distinct and palpable injury but are not among the classes of persons authorized by statute to appeal an agency decision. On the other hand, the stockholders are an authorized class but lack a distinct and palpable injury to qualify as a "party aggrieved" or "substantially prejudiced." Therefore, none of the Petitioners qualify for appellate standing before this Court.

---

62. *See id.* § 54–7–15(2)(a) (Supp.2007).

63. 2006 UT 74, ¶ 19, 148 P.3d 960.

64. *Salt Lake City Corp. v. Prop. Tax Div.*, 1999 UT 41, ¶ 11, 979 P.2d 346 (quoting *Jenkins v. Swan*, 675 P.2d 1145, 1148 (Utah 1983)) (alterations in *Salt Lake City Corp.*); *see Sierra Club*, 2006 UT 74, ¶ 19, 148 P.3d 960.

65. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *see Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153–54, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *S & G, Inc. v. Morgan*, 797 P.2d 1085, 1087 (Utah 1990).

## CONCLUSION

¶ 63 We affirm the Commission's Intervention Order denying Ball and Geddes intervention and dismiss the petition for review of the Approval Order for lack of appellate standing.

¶ 64 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT's opinion.