*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2019 UT 26**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

UTAH OFFICE OF CONSUMER SERVICES and UTAH ASSOCIATION OF
ENERGY USERS,
*Petitioners,*

*v.*

PUBLIC SERVICE COMMISSION OF UTAH, UTAH DIVISION OF PUBLIC
UTILITIES, and PACIFICORP D/B/A ROCKY MOUNTAIN POWER,
*Respondents.*

No. 20170364
Filed June 27, 2019

On Petition for Review of Agency Decisions

Attorneys:

Robert J. Moore, Asst. Att'y Gen., Steven W. Snarr, Special Asst.
Att'y Gen., Salt Lake City, for petitioner Utah Office of Consumer
Services

Gary A. Dodge, Phillip J. Russell, Salt Lake City, for petitioner Utah
Association of Energy Users

Melanie A. Reif, Salt Lake City, for respondent Public Service
Commission of Utah

Sean D. Reyes, Att'y Gen., Brent A. Burnett, Asst. Solic. Gen., Patricia
E. Schmid, Asst. Att'y Gen., Justin C. Jetter, Asst. Att'y Gen., Salt
Lake City for respondent Utah Division of Public Utilities

R. Jeff Richards, Yvonne R. Hogle, D. Matthew Moscon, Bret W.
Reich, Salt Lake City, for respondent PacifiCorp d/b/a Rocky
Mountain Power

Jenniffer Nelson Clark, Cameron L. Sabin, Salt Lake City, for amicus
curiae Questar Gas Company d/b/a Dominion Energy Utah

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in
which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUSTICE PEARCE,
and JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1 The Utah Office of Consumer Services and the Utah Association of Energy Users ("Consumer Groups") challenge orders from the Public Service Commission in two related cases. We consolidated these cases because they raise the same threshold legal question—whether the Commission has the authority to impose "interim" rates as an element of the energy balancing account procedures described in Utah Code section 54-7-13.5. We hold that the Commission lacks this authority.

¶2 The interim rates at issue were imposed without a requirement that the public utility prove by "substantial evidence" that the costs incorporated in the rates were "prudently incurred" or "just and reasonable." We hold that this runs afoul of the controlling standard set forth in Utah Code section 54-7-13.5(2)(e)(ii). And we set aside the Commission's orders on this basis.

I

¶3 The Public Service Commission is authorized by statute to "supervise and regulate every public utility in this state." UTAH CODE § 54-4-1. One of the utilities regulated by the Commission is PacifiCorp, d/b/a Rocky Mountain Power, an electric power provider. PacifiCorp's rates are set by the Commission under terms and conditions set forth in the Utah code. A threshold step in the rate setting process is a "general rate" case.

¶4 In a general rate case the Commission estimates what it will cost PacifiCorp to provide electricity to customers. That estimate becomes the utility's "base rate." *See id.* § 54-7-12(1)(a)(i). Included in the base rate is a projected estimate of PacifiCorp's net power costs. In any given year, however, actual net power costs will vary from the costs predicted in a general rate case. With that in mind, the legislature created a mechanism to account for these differences—the "energy balancing account," or EBA. *See id.* § 54-7-13.5.

¶5 An EBA is an account used to track PacifiCorp's incurred net power costs. The account must be authorized by the Commission. It "become[s] effective" upon a finding that it is "(i) in the public interest; (ii) for prudently-incurred costs; and (iii) implemented at the conclusion of a general rate case." *Id.* § 54-7-13.5(2)(b). Once an EBA is approved, PacifiCorp is authorized to track the costs identified in that account. Such EBA costs include fuel, purchased power, and wheeling expenses—"less wholesale revenues." *Id.* § 54-7-13.5(1)(b).

¶6  PacifiCorp must annually file "a reconciliation of the energy balancing account with the [C]ommission" seeking either a recovery from or a refund to customers—based on the difference between the estimated net power costs reflected in the base rate and PacifiCorp's actual net power costs incurred that year. *Id.* § 54-7-13.5(2)(c). PacifiCorp bears the burden of proving that its costs are "prudently incurred." *Id.* § 54-7-13.5(2)(d). This annual filing is subject to review by the Division of Public Utilities. The Division conducts an audit and submits a report to the Commission. And the report is used by the Commission to determine whether a refund or recovery is appropriate. This process is repeated annually until a new base rate is set in a new general rate case.

¶7  PacifiCorp's rates have been established in accordance with the above procedures. In 2009, PacifiCorp filed an application for approval of a proposed EBA in accordance with the newly-passed EBA statute—Utah Code section 54-7-13.5. The Commission opened a docket to review the filing. Two years later, the Commission approved the EBA and ordered the implementation of a four-year EBA pilot program. The Commission asked the Division to file periodic reports evaluating the program. The Commission also sanctioned the use of an "interim rate" procedure as part of the EBA process. Under that process, PacifiCorp would file its annual EBA report comparing estimated power costs with its actual power costs. PacifiCorp would propose an interim rate based on the difference between estimated and actual costs. The Division would then review PacifiCorp's report and determine whether it departed from prior years' filings. If not, the Division would recommend that the Commission approve PacifiCorp's proposed interim rate. The Commission would review the Division's recommendation and hold a hearing. If an interim rate was approved by the Commission, the interim rate would go into effect while the Division completed its full audit of PacifiCorp's EBA report to determine if PacifiCorp's claimed costs were prudently incurred.

¶8  On August 30, 2012, the Commission issued an order eliminating the EBA interim rate process. The Commission indicated that it had failed to consider what costs associated with PacifiCorp's financial swap transactions[1] qualified for recovery under the EBA

---

[1] Swap transactions are "financial transaction[s] between two parties . . . in which payments or rates are exchanged over a specified

(continued . . .)

when it initially approved the interim rate process. In the Commission's view, a determination of what costs could be recovered for these swap transactions would require a significant amount of time and likely would result in highly contentious litigation in both the interim and final EBA hearings. So the Commission decided that an interim rate process was no longer appropriate for the EBA mechanism.

¶9 The Division filed its first report evaluating the EBA program in May 2014. The Division noted that it had been required to devote significant time to review PacifiCorp's filings due to the complexity of the EBA process. And it recommended some structural changes. The Commission, however, determined that it was too early to make any changes to the EBA program.

¶10 The Division filed its final report two years later. It recommended that "[t]he time period for [its] audits . . . be extended to one year and interim rates . . . be established until the Division can complete its audit." On February 16, 2017, the Commission issued an order adopting the Division's recommendation that interim rates be reinstated in the EBA mechanism. In so concluding, the Commission reasoned that circumstances had changed since its August 30, 2012 order rejecting interim rates. Specifically, the Commission asserted that the contentious issues and litigation surrounding PacifiCorp's swap transactions had been resolved. And for that reason the Commission concluded that an interim rate process was now appropriate.

¶11 The Commission asserted that the interim rate subsection of the general rate case statute, *id.* § 54-7-12(4)(a), authorized it to establish interim rates in an EBA proceeding. And it incorporated the procedural and timing requirements outlined in that subsection. First, the Commission defined PacifiCorp's burden of proof to be commensurate with the burden of proof standard established in subsection 54-7-12(4)(a)(iii). *See id.* § 54-7-12(4)(a)(iii) (stating that a utility "shall establish an adequate prima facie showing that the

---

period and according to specified conditions." *Swap*, BLACK'S LAW DICTIONARY (11th ed. 2019). PacifiCorp uses swap transactions to hedge market-price risk, particularly for the market price of natural gas. A natural gas swap is a contract that gives PacifiCorp the right to buy or sell a specified amount of natural gas at a specific price within a specific timeframe in exchange for an upfront premium.

interim rate increase or decrease is justified"). The Commission asked the Division to review PacifiCorp's EBA filing and determine whether the filing "appears to not depart from prior years' filings." PacifiCorp would eventually have to prove by substantial evidence that its claimed costs were prudently incurred. But a lower standard was appropriate in the interim in the Commission's view. Second, the Commission determined that it would act upon a request for interim rates within 45 days of PacifiCorp's EBA filing. *See id.* § 54-7-12(4)(a)(ii).

¶12 The Commission found further justification for these decisions in our case law. It noted that in *Questar Gas Co. v. Utah Public Service Commission*, 2001 UT 93, 34 P.3d 218, we recognized the Commission's "authority to authorize interim rates in the Questar Gas 191 balancing account mechanism." And it reasoned that "PacifiCorp's EBA is in some ways similar to Account 191." Drawing on these similarities, the Commission determined that *Questar Gas* supported its decision to allow interim rates and adopt the procedures described in subsection 54-7-12(4)(a).

¶13 The Consumer Groups filed a petition for reconsideration and rehearing challenging the legality of the decision to incorporate an interim rate process in the EBA mechanism. The Consumer Groups asserted that subsection 54-7-12(4)(a)(ii) could not be applied outside of a general rate case, and insisted that the interim rate procedures described in subsection (4)(a) run afoul of section 54-7-13.5 by altering the standard for cost recovery and PacifiCorp's burden of proof. *See* UTAH CODE § 54-7-13.5(2)(e) ("An energy balancing account may not alter: (i) the standard for cost recovery; or (ii) the electrical corporation's burden of proof."). The Commission rejected the Consumer Groups' petition. And the petition to this court in Case No. 20170364 followed.

¶14 About a year later, PacifiCorp submitted its 2018 EBA filing. That filing differed in one significant way from PacifiCorp's 2017 filing: It proposed to recover EBA costs in the amount of approximately $2.8 million on an interim basis. The Division reviewed PacifiCorp's filing and determined that it appeared not to depart from the prior years' filings. And on that basis the Division recommended that PacifiCorp be allowed to recover its claimed EBA costs. The Commission agreed. It issued an order on April 27, 2018 imposing interim rates. The Consumer Groups filed a petition for reconsideration. They raised the same arguments that they made when challenging the Commission's February 16, 2017 order approving an interim rate procedure. The Commission rejected the

Consumer Groups' petition. And the petition in Case No. 20180536 followed. Since the Commission's April 27, 2018 order, customers have been paying PacifiCorp the disputed rates.

## II

¶15 The Consumer Groups challenge the Commission's interim rate orders on two grounds. They first contend that the Commission lacks the authority to interject interim rates in the EBA mechanism. Second, they assert that the Commission's orders mark a departure from prior practice in violation of the Utah Administrative Procedures Act ("UAPA"). We agree with the Consumer Groups' first argument. Specifically, we conclude that the Commission violated the statutory mandate that an EBA "may not alter . . . the electrical corporation's burden of proof." UTAH CODE § 54-7-13.5(2)(e). And we set aside the Commission's orders on that basis (without reaching the question whether the Commission acted inconsistently with prior practice in violation of UAPA).

¶16 Before expounding on the basis for our decision we first address statutory standing questions raised by the Division and the Commission. Those questions arise under a statutory requirement that parties challenging an order of the Commission demonstrate that they have been "substantially prejudiced" by the Commission's orders. *Id.* § 63G-4-403(4). The Division and the Commission assert that the Consumer Groups fail to carry this burden. We disagree for reasons set forth below.

## A

¶17 The UAPA governs claims asserted against an agency. UTAH CODE § 63G-4-105(1) ("The procedures for agency action, agency review, and judicial review contained in this chapter are applicable to all agency adjudicative proceedings commenced by or before an agency on or after January 1, 1988."). Before a court may grant relief under the UAPA, it must determine that the "person seeking judicial review has been substantially prejudiced." *Id.* § 63G-4-403(4). "A party has been substantially prejudiced if 'the alleged error was not harmless.'" *Utah Chapter of the Sierra Club v. Utah Air Quality Bd.*, 2006 UT 74, ¶ 15, 148 P.3d 960 (quoting *WWC Holding Co. v. Pub. Serv. Comm'n of Utah*, 2002 UT 23, ¶ 7, 44 P.3d 714).

¶18 The Division challenges the Consumer Groups' statutory standing to advance the claims set forth in the first petition. The Consumer Groups' primary claim of prejudice is related to the imposition of interim rates. But those rates did not go into effect

until after the Consumer Groups filed their first petition. So the Division asserts that the Consumer Groups' first petition should be dismissed for failure to demonstrate substantial prejudice.

¶19 We disagree. A party may suffer substantial prejudice even though the claimed injury is one not yet realized. This principle was key to our decision in *Utah Chapter of the Sierra Club*, 2006 UT 74. There we determined that petitioners had standing to pursue their claims even though their alleged injury had not yet been suffered. The Utah Division of Air Quality had granted a permit to the Sevier Power Company authorizing the construction of a coal-fired power plant. *Id.* ¶ 1. Although the power plant had not yet been built, we noted that the plant presented a serious danger of future pollution. *Id.* ¶ 22. And we explained that that pollution would jeopardize the petitioners' health, the value of their land, and their enjoyment of the surrounding ecosystem. *Id.* We accordingly concluded that petitioners had standing to challenge the Utah Air Quality Board's decision.

¶20 We reach a similar conclusion here. We hold that the Consumer Groups' first petition clears the threshold hurdle of demonstrating substantial prejudice. The Consumer Groups' alleged prejudice was sufficiently imminent when the Commission decided to reinstate interim rates. The Commission would not have reinstated interim rates if PacifiCorp had no intention of recovering costs on an interim basis. PacifiCorp and the Division recommended that the Commission adopt an interim rate procedure so PacifiCorp could recover its EBA costs while the Division finished its audit. The prospect that the Consumer Groups would end up paying an interim rate surcharge was more than hypothetical. The facts of these consolidated cases demonstrate as much. We thus conclude that we can consider the merits of the Consumer Groups' first petition.

¶21 The Commission also challenges the Consumer Groups' statutory standing to advance the claims set forth in the second petition. In the Commission's view, the Consumer Groups are estopped from asserting that they have suffered substantial prejudice from the Commission's order requiring customers to pay $2.8 million on an interim basis. And because the Consumer Groups are foreclosed from claiming that they have been substantially prejudiced, the Commission asks us to dismiss the Consumer Groups' second petition on statutory standing grounds. We disagree with the premise of this argument. We do not think that the Consumer Groups are estopped from arguing substantial prejudice.

And we believe that they have satisfied their burden of demonstrating such prejudice.

¶22 The alleged error here is that the Commission erroneously interjected an interim rate procedure into the EBA mechanism. And the claimed prejudice stemming from this error is that customers are being forced to pay $2.8 million in increased rates prematurely. The alleged error has thus harmed customers.

¶23 The Commission asks us to recognize that the Consumer Groups brought this harm upon themselves. It concedes that customers are currently paying a surcharge to cover $2.8 million of PacifiCorp's claimed net power costs. But it argues that the Consumer Groups stipulated to these costs. And in the Commission's view that stipulation bars the Consumer Groups from claiming prejudice.

¶24 In 2015, the Consumer Groups reached a settlement agreement with PacifiCorp over costs related to the closure of the Deer Creek Mine. As part of that settlement, the Consumer Groups agreed that the Commission "should enter an order authorizing" PacifiCorp to recover certain costs associated with its "unrecovered investment in the Deer Creek Mine." Had the Consumer Groups not stipulated to these costs, customers would have received a surcredit under PacifiCorp's 2018 EBA filing. So, the Commission contends, the Consumer Groups cannot claim substantial prejudice when, setting aside costs to which they agreed, the interim EBA recovery would have benefited customers.

¶25 We disagree with the notion that the Consumer Groups' stipulation negates their claim of substantial prejudice. While the Consumer Groups stipulated to PacifiCorp recovering certain costs, they did not stipulate to recovery through interim rates.[2] And the Commission's approval of interim rates serves as the basis for the Consumer Groups' claim of prejudice. Because customers are being forced to pay interim rates, the Consumer Groups assert that

---

[2] *See Prinsburg State Bank v. Abundo*, 2012 UT 94, ¶ 13, 296 P.3d 709 ("[A] stipulation entered into by the parties and accepted by the court 'acts as an estoppel upon the parties thereto and is conclusive *of all matters necessarily included in the stipulation*.'" (emphasis added) (quoting *Yeargin, Inc. v. Auditing Div. of Utah State Tax Comm'n*, 2001 UT 11, ¶ 20, 20 P.3d 287)).

customers are losing out on potential interest they could otherwise earn in the time between paying the interim rates and the true up at the conclusion of the EBA process. This injury is alone sufficient to satisfy the Consumer Groups' burden of demonstrating substantial prejudice.

¶26 The fact that the Consumer Groups represent customers whose individual injuries are relatively small does not undermine this conclusion. The Utah Office of Consumer Services ("UOCS") is a government agency specifically tasked with "assess[ing] the impact of utility rate changes . . . on: (i) residential consumers; and (ii) small commercial consumers." UTAH CODE § 54-10a-301(1)(a). It is authorized to "commence an original proceeding, file a complaint, appear as a party, appeal, or otherwise represent residential consumers or small commercial consumers in a matter or a proceeding involving regulation of an applicable public utility." *Id.* § 54-10a-301(2)(b)(i). The Utah Association of Energy Users ("UAE") is a non-profit organization that similarly represents the interests of customers before the Commission. UTAH ASS'N OF ENERGY USERS, *About*, https://www.utahenergyusers.org/about-1 (last visited June 11, 2019). Its members include large industrial and commercial companies. The harm suffered by the individual customers represented by UOCS and UAE is relatively small considering that the $2.8 million in interim rates is spread out across PacifiCorp's nearly one million Utah customers. ROCKY MOUNTAIN POWER, *Quick Facts*, https://www.rockymountainpower.net/about/cf/qf.html (last visited June 11, 2019). But UOCS is statutorily authorized to represent all residential or small commercial consumers before the Commission. UTAH CODE § 54-10a-301(1)(a), (2)(a)–(b). And the customers composing UAE are large corporations, each of which could satisfy the burden of demonstrating substantial prejudice. *See Utah Chapter of the Sierra Club*, 2006 UT 74, ¶ 21 ("An association . . . has standing if its individual members have standing and the participation of the individual members is not necessary to the resolution of the case."). All of this is to say that the Consumer Groups have suffered substantial prejudice from the Commission's orders interjecting interim rates into the EBA mechanism. We therefore conclude that the Consumer Groups have standing. And we accordingly proceed to the merits of their petitions.

B

¶27 The Consumer Groups contend that the Commission "erroneously interpreted or applied" Utah law when it interjected an interim rate process into the EBA mechanism. *See* UTAH CODE §

63G-4-403(4)(d). We agree and thus set aside the Commission's orders. We expound on this holding below. First we review and reject the Commission's proffered justifications for its orders. Then we explain how the Commission's orders altered PacifiCorp's burden of proof in violation of Utah Code section 54-7-13.5(2)(e)(ii).

1

¶28 When reviewing an agency action, "the appropriate standard of review . . . depend[s] on the type of action in question . . . and whether it can be characterized as a question of law, a question of fact, or a mixed question of law and fact." *Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 22, 308 P.3d 461. Here we are faced with a question of law—whether the Commission has the authority to impose interim rates as part of the EBA process. And we review such questions for correctness, according no deference to the agency's determination. *Hughes Gen. Contractors, Inc. v. Utah Labor Comm'n*, 2014 UT 3, ¶ 6, 322 P.3d 712.

¶29 The Commission cited Utah Code section 54-7-12(4)(a)(ii) as the basis for its authority to impose interim rates through the EBA mechanism. That subsection states as follows:

> The commission, on its own initiative or in response to an application by a public utility or other party, may, after a hearing, allow any rate increase or decrease proposed by a public utility, or a reasonable part of the rate increase or decrease, to take effect on an interim basis within 45 days after the day on which the request is filed, subject to the commission's right to order a refund or surcharge.

UTAH CODE § 54-7-12(4)(a)(ii). The Commission acknowledged that this provision is surrounded by subsections referring to a general rate case and not the EBA mechanism. But it also emphasized that subsection (4)(a)(ii) itself makes no explicit reference to a general rate case. And on that basis it concluded that the "plain language" of "54-7-12(4)(a)(ii) authorizes [it] to establish interim rates in an EBA cost-recovery proceeding."

¶30 This is an erroneous reading of the statute. When interpreting a statute, our goal is to give effect to the words enacted into law by the legislature. *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465. We do not, however, read statutory text in isolation. *Monarrez v. Utah Dep't of Transp.*, 2016 UT 10, ¶ 11, 368 P.3d 846. We must read it in context, taking into consideration

surrounding terms and associated provisions. *Olsen*, 2011 UT 10, ¶ 12. And when subsection (4)(a)(ii) is read in context it becomes obvious that it is meant to apply only to general rate cases.

¶31 The provisions surrounding subsection (4)(a)(ii) clearly speak to the imposition of interim rates in a general rate case—or, in other words, authorizing a new base rate on an interim basis. The Commission concedes as much. But it fails to recognize the significance of this concession. Once subsection (4)(a)(ii) is read in conjunction with subsections (4)(a)(i) and (4)(a)(iii), it becomes clear that subsection (4)(a)(ii) authorizes the imposition of interim rates only in a general rate case and not in an EBA proceeding.

¶32 All of subsection (4)'s provisions are interrelated and speak to imposing interim rates in a general rate case. Subsection (4)(a)(i) states that "[a] request for interim rates shall be made within 90 days after the day on which a public utility *files a complete filing for a general rate increase or a general rate decrease*." UTAH CODE § 54-7-12(4)(a)(i) (emphasis added). And subsection (4)(a)(ii), in turn, says that the rate increase or decrease may "take effect on an interim basis within 45 days after the day on which *the request* is filed." *Id.* § 54-7-12(4)(a)(ii) (emphasis added). "The request" spoken of here ties back to "the request" mentioned in subsection (4)(a)(i). Subsection (4)(a)(iii) further ties together subsections (4)(a)(i) and (4)(a)(ii). It reduces the utility's burden of proof when an interim request is made *in a general rate case*. It states that "[t]he evidence presented in the hearing held pursuant" to the terms of subsection (4) "need not encompass all issues that may be considered in a rate case hearing held pursuant to [s]ubsection (2)(d)"—the hearing required in a general rate case. *Id.* § 54-7-12(4)(a)(iii).

¶33 This language shows that each subpart of subsection (4) is interconnected. Importantly, it also highlights that each subpart deals with the imposition of interim rates in a *general rate case*. The entirety of section 54-7-12 is dedicated to describing the procedures for a general rate case. It would be odd to isolate subsection (4)(a)(ii) from all of its surrounding provisions—and to conclude that the absence of the words "general rate" in that subsection is an indication that the procedures mentioned therein apply outside the general rate process (in an EBA proceeding). This we decline to do.

¶34 The absence of an express reference to a general rate case in subsection (4)(a)(ii) is accordingly inconsequential. Subsection (4) is clearly speaking about imposing interim rates in a general rate case. And for this reason this provision cannot serve as the source of the

Commission's authority to impose interim rates in the EBA mechanism.

¶35 In reaching a contrary conclusion the Commission also cited case law from this court. It noted that in *Questar Gas Co. v. Utah Public Service Commission*, 2001 UT 93, 34 P.3d 218, we "recognized the [Commission's] authority to authorize interim rates in the Questar Gas 191 balancing account mechanism." And because "PacifiCorp's EBA is in some ways similar" to that balancing account, the Commission concluded that the *Questar Gas* holding supports its decision to impose interim rates.

¶36 We disagree. In *Questar Gas* we were asked to opine on the propriety of interim rates in the specific context of the Questar Gas 191 balancing account. *See id.* ¶ 12. And there may be some similarities between that account and PacifiCorp's EBA. But the *Questar Gas* decision says nothing about the statutory scheme implicated here. Our opinion in that case does not speak to whether section 54-7-13.5 authorizes the imposition of interim rates in an EBA proceeding. That's because the 191 balancing account was in no way tied to section 54-7-13.5—that provision didn't even exist yet. So the 191 balancing account was not implemented under section 54-7-13.5; it was implemented under the Commission's "ample general power to fix rates and establish accounting procedures." *Id.* (quoting *Utah Dep't of Bus. Regulation v. Pub. Serv. Comm'n of Utah*, 720 P.2d 420, 423 n.4 (Utah 1986)) (citing UTAH CODE § 54-4-1).

¶37 The Commission latches onto this language from *Questar Gas*. It says that this language—in conjunction with the favorable cite to Utah Code section 54-4-1—stands as an acknowledgment that the Commission has authority to impose interim rates in *any* rate proceeding. We disagree. The Commission certainly has broad authority. But that authority is not so broad as to read statutory EBA safeguards out of existence.

¶38 Section 54-4-1 confers on the Commission "power and jurisdiction to supervise and regulate every public utility in this state . . . and to do all things, whether herein specifically designated or in addition thereto, which are necessary or convenient in the exercise of such power and jurisdiction." UTAH CODE § 54-4-1. We cited this provision in *Questar Gas* as support for the proposition that the Commission has "ample general power to fix rates and establish accounting procedures." *Questar Gas*, 2001 UT 93, ¶ 12 (quoting *Utah Dep't of Bus. Regulation*, 720 P.2d at 423 n.4). Yet that "ample power" is not without limits. Some of those limits are prescribed in the EBA

statute. And specific statutes (like the EBA provisions) control more general ones (like section 54-4-1). *See Lyon v. Burton*, 2000 UT 19, ¶ 17, 5 P.3d 616. So if the EBA statute prohibits the Commission from imposing interim rates in the manner by which it did—as the EBA statute does—section 54-4-1 cannot save the Commission's orders.

¶39 The same goes for the Commission's reliance on section 54-4-4.1. That section states that "[t]he [C]ommission may, by rule or order, adopt any method of rate regulation that is: (a) consistent with this title; (b) in the public interest; and (c) just and reasonable." UTAH CODE § 54-4-4.1(1). This section explicitly recognizes limits on the Commission's authority. And one of those limits is that any method of rate regulation the Commission adopts must be consistent with Title 54. So if Title 54 prohibits the Commission from imposing interim rates in the manner by which it did—as Title 54 does—then the Commission's reliance on section 54-4-4.1 is to no avail.

¶40 For all these reasons, we reject the Commission's stated justifications for interjecting interim rates into the EBA mechanism. Having done so, we proceed to explain how the Commission's orders run afoul of the EBA statute and must thus be set aside.

2

¶41 The Commission is given broad authority to define the procedures and timing by which an EBA is annually reconciled. But that authority is not so broad as to allow the Commission to alter the burden of proof that PacifiCorp must carry before recovering its EBA costs. Yet that is exactly what the Commission did here. And we set aside the Commission's orders on this basis.

¶42 Section 54-7-13.5 merely provides the framework for authorizing an EBA and approving a utility's annual EBA filing. Many of the details are left to the Commission. The statute, for instance, does not define the timing for cost recovery. It allows PacifiCorp to recover its actual EBA costs through a surcharge. *Id.* § 54-7-13.5(2)(c)(i). And it requires PacifiCorp to "file a reconciliation of the energy balancing account with the commission at least annually" to recover these costs. *Id.* § 54-7-13.5(2)(c)(ii).

¶43 The statute gives the Commission broad discretion to establish a mechanism by which costs are recovered. Section 54-7-13.5 states that the method by which PacifiCorp recovers its EBA costs shall "be incorporated into base rates in *an appropriate commission proceeding*." *Id.* § 54-7-13.5(2)(f)(ii) (emphasis added). The statute never fully defines what constitutes "an appropriate commission proceeding." And in this sense the Commission is given

broad discretion to develop the mechanism of recovery. But that discretion is not boundless.

¶44 Limits are placed on the Commission's authority to authorize PacifiCorp to recover its EBA costs. The most relevant of these limits for purposes of these consolidated cases are defined in subsection (2)(e): "An energy balancing account may not alter: (i) the standard for cost recovery; or (ii) the electrical corporation's burden of proof." *Id.* § 54-7-13.5(2)(e). In other words, if a chosen EBA mechanism alters either the standard for cost recovery or PacifiCorp's burden of proof, the mechanism is improper and the Commission has exceeded its statutory authority.

¶45 The standard for cost recovery is statutorily defined. PacifiCorp may recover its costs only to the extent they are "prudently incurred." *Id.* § 54-7-13.5(2)(d). The Commission acknowledges this standard. And we do not believe that it has been altered here. In its order reaffirming its decision to interject interim rates, the Commission specifically stated that "the EBA statute only allows for recovery of '[p]rudently incurred actual costs.'" So we cannot say that it applied the wrong standard of cost recovery.

¶46 The Commission did, however, err in the burden of proof that it applied. The statute itself does not specify an applicable burden of proof. But we have repeatedly said that a utility has the burden to prove that its costs are prudently incurred—or are "just and reasonable"—by "substantial evidence." *See Comm. of Consumer Servs. v. Pub. Serv. Comm'n of Utah*, 2003 UT 29, ¶ 14, 75 P.3d 481; *Utah Dep't of Bus. Regulation v. Pub. Serv. Comm'n*, 614 P.2d 1242, 1245 (Utah 1980). And the Commission concedes that it did not require PacifiCorp to carry a "substantial evidence" burden of proof when it approved the request to impose interim rates.

¶47 The Commission seeks to justify its approach on the ground that the applicable burden of proof will eventually be satisfied after a complete audit and a final hearing. Under the EBA framework under review, the Commission notes that PacifiCorp will eventually be required to show by "substantial evidence" that its costs are prudently incurred. This will happen at a "true up" after a complete audit and public hearing—at which time customers will be allowed to recover a surcredit if any costs incorporated in the interim rates are shown not to be justified by substantial evidence. *See* UTAH CODE § 54-7-13.5(2)(h)–(j). Fair enough. But that doesn't solve the problem. By law PacifiCorp is allowed to recover its claimed costs through an interim rate only *after* proving by substantial evidence that its costs

are prudently incurred. *See id.* § 54-7-13.5(2)(d), (e)(ii); *Comm. of Consumer Servs.*, 2003 UT 29, ¶ 14. And the interim EBA rate process authorizes PacifiCorp to impose rates in the absence of such a showing.

¶48 We reverse on this basis. We conclude that the Commission's orders unlawfully altered the burden of proof that PacifiCorp must satisfy before recovering its claimed EBA costs. And we accordingly set aside the Commission's orders interjecting an interim rate procedure into the EBA process and authorizing PacifiCorp to recover $2.8 million on an interim basis.

III

¶49 In reversing the Public Service Commission and setting aside its orders we take no position on a line of policy argument presented by the Commission in its briefing. The Commission asserts that the interposition of an interim rate procedure into the EBA process would better protect consumers in a few ways—by ensuring that rates are just and reasonable and decreasing the likelihood that either a future generation of customers would be burdened with costs incurred to serve customers in a prior year or that a future generation of customers would benefit from rate refunds to which prior customers were entitled. That may be. Or perhaps the Consumer Groups have the better of the argument on these policy issues; they, after all, advance a different view. But we leave these questions for the legislature. We decide only that the current statutory scheme does not condone the interim rate process as it now stands. And we leave it to the legislature, if it so chooses, to reopen the governing statutes to expressly authorize an interim rate procedure as an element of the EBA process.