*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2025 UT 19**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

KAREN JEAN ANDERSON,
*Petitioner,*

*v.*

UTAH DEPARTMENT OF COMMERCE,
*Respondent.*

No. 20230984
Heard November 1, 2024
Filed July 3, 2025

Petition for Review of Agency Decision
On Certification from the Court of Appeals

Attorneys:

James S. Jardine, Gregory N. Hoole, Salt Lake City, for petitioner

Derek E. Brown, Att'y Gen., Sarah Goldberg, Asst. Solic. Gen.,
Valerie M. Wilde, Special Asst. Att'y Gen., Salt Lake City,
for respondent

JUSTICE HAGEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, JUSTICE PETERSEN, JUSTICE POHLMAN,
and JUDGE ORME joined.

Having recused himself, ASSOCIATE CHIEF JUSTICE PEARCE does not
participate herein; COURT OF APPEALS JUDGE GREGORY K. ORME sat.

JUSTICE HAGEN, opinion of the Court:

## INTRODUCTION

¶1 The Utah Division of Professional Licensing (DOPL) filed
a notice of agency action against Karen Jean Anderson, a licensed
advanced practice registered nurse (APRN). DOPL alleged that
Anderson unlawfully engaged in the practice of medicine and
practiced outside the scope of her APRN license by performing
tumescent liposuction and fat grafting procedures. The parties do

not dispute that under the Utah Code these procedures are considered ablative cosmetic medical procedures.

¶2    In its order, DOPL sustained these allegations, reasoning that with few exceptions, physicians and osteopathic physicians have "exclusive authority" to perform ablative cosmetic medical procedures. DOPL barred Anderson from performing the procedures and imposed a fine. Anderson next sought agency review with the Department of Commerce. The Department reduced the fine but otherwise upheld DOPL's order. Anderson then sought judicial review.

¶3    We hold that the Utah Code bars APRNs from independently performing ablative cosmetic medical procedures. The statutory scheme limits the performance of such procedures to either those licensed to practice medicine—meaning physicians and osteopathic physicians—or licensees whose scope of practice includes the authority to operate or perform surgery. Because the scope of practice for APRNs contains no such authorization, Anderson both unlawfully practiced medicine and exceeded the scope of her APRN license by performing the ablative cosmetic medical procedures of tumescent liposuction and fat grafting. Therefore, we do not disturb the Department's order.

## BACKGROUND

¶4    Since 2012, DOPL has licensed Anderson as an APRN. In 2019, Anderson began working as an independent contractor providing body contouring services such as "tumescent liposuction and fat transfer procedures for breast and buttock augmentation using the Vibrasat device" with local anesthesia. Tumescent liposuction is "the most common type of liposuction" and "involves injecting a large amount of medicated solution into" areas such as the breasts or buttocks. *Liposuction*, MEDLINEPLUS, https://medlineplus.gov/ency/article/002985.htm (last visited June 25, 2025). Following injection, the fluid is "suctioned out along with the fat." *Id.* The Vibrasat device is a Class II FDA-approved medical device that "vibrat[es] tissue for removal." This technique is "often used together with the tumescent technique." *Id.* Fat grafting involves "transferring" the removed "fat deposits from one part of the body to another."

¶5    In 2022, DOPL filed a notice of agency action alleging that Anderson had engaged in the practice of medicine without a license and practiced outside the scope of her APRN license. The Utah Board of Nursing held a hearing and later issued findings of

fact, conclusions of law, and a recommended order to DOPL. The nursing board concluded that under Utah's Nurse Practice Act (NPA) an APRN's scope of practice overlaps "with the medical practices of a physician" as laid out in the Utah Medical Practice Act (MPA) and Utah Osteopathic Medical Practice Act (OMPA). The nursing board determined that the tumescent liposuction and fat grafting procedures conducted by Anderson did not fall "exclusively under the [MPA and OMPA]" and therefore Anderson did not engage in the unlawful practice of medicine. Furthermore, the nursing board concluded that Anderson did not exceed the scope of her APRN license. The board reasoned that the NPA intentionally gives APRNs broad authority to "correct, treat, prescribe controlled substances within limits, and administer local anesthesia" because it would "be limiting" to create a comprehensive list of all possible procedures an APRN may perform. The nursing board determined tumescent liposuction and fat grafting fell within the authorization of this broad definition.

¶6     After reviewing the record and meeting with members of the nursing board, DOPL rejected the board's recommendation on the issues relevant to this appeal. DOPL explained that the heart of this dispute was whether APRNs may perform ablative cosmetic medical procedures, including the tumescent liposuction and fat grafting performed here. DOPL determined that the legislature had "settled [this issue] more than a decade ago" when it granted, with few exceptions, "exclusive authority to perform non-exempt ablative cosmetic medical procedures to medical and osteopathic doctors." DOPL concluded that Anderson unlawfully engaged in the practice of medicine and practiced beyond the scope of her APRN license. Anderson received a fine, and DOPL ordered her to "cease and desist from performing non-exempt ablative cosmetic medical procedures including tumescent liposuction and fat transfer procedures."

¶7     Anderson submitted a request for agency review to the Department of Commerce. The Department reduced Anderson's fine but otherwise affirmed DOPL's order. The Department reasoned that Anderson had "not shown that her broad reading of the term 'correction' in the scope of practice for an APRN allow[ed] her to conduct ablative procedures like tumescent liposuction that are otherwise limited to other licensees."

¶8     Anderson filed a petition for judicial review with the court of appeals, which has original jurisdiction to review the

Department's final orders resulting from formal adjudicative proceedings. *See* UTAH CODE § 78A-4-103(3)(a)(i)(A). The court of appeals subsequently certified the case to this court. *See id*. § 78A-4-103(5). We exercise jurisdiction pursuant to Utah Code section 78A-3-102(3)(b).[1]

**ISSUE AND STANDARD OF REVIEW**

¶9 Anderson contends that the Department erred in determining that Utah's licensing statutes prohibit Anderson, a licensed APRN, from performing the ablative cosmetic medical procedures at issue in this case. This court has authority to review final agency actions and may grant relief if it determines that "the agency has erroneously interpreted or applied the law" and the "person seeking judicial review has been substantially prejudiced." UTAH CODE § 63G-4-403(5)(d).[2] We review agency action that is a question of law, such as interpreting a statute, "for correctness, according no deference to the agency's determination." *Utah Off. of Consumer Servs. v. Pub. Serv. Comm'n of Utah*, 2019 UT 26, ¶ 28, 445 P.3d 464.

---

[1] The Department argues that we should dismiss Anderson's petition for lack of jurisdiction because in her opening brief she only asked us to reverse the DOPL order, which was not a final agency action. "To seek judicial review of final agency action resulting from formal adjudicative proceedings, the petitioner [must] file a petition for review of agency action with the appropriate appellate court in the form required by the appellate rules of the appropriate appellate court." UTAH CODE § 63G-4-403(2)(a). Anderson complied with this provision by filing a petition for review with the court of appeals identifying the Department's order as the final agency action to be reviewed. The mistaken reference to DOPL's decision in Anderson's briefing does not affect our jurisdiction. Nor does it impede our review because there is no significant distinction between the reasoning in the two orders.

[2] While the 2023 version of the Utah Code applies and the legislature has made some subsequent changes to the code, no substantive changes are applicable here, nor do any of the changes impact our analysis. Thus, we cite the current version of the code throughout this opinion for both convenience and clarity.

## ANALYSIS

¶10 We begin with an overview of the statutory scheme at issue. Title 58 of the Utah Code provides the framework for professional licensing in Utah. *See* UTAH CODE §§ 58-1-102 to -90-101. The first chapter (the Umbrella Act) applies to each of the title's regulated professions. *Id.* §§ 58-1-102 to -604. Nearly all the remaining chapters govern a specific profession such as the NPA for nurses, *id.* §§ 58-31b-101 to -803, the MPA for medical doctors, *id.* §§ 58-67-101 to -807, and the OMPA for osteopathic doctors, *id.* §§ 58-68-101 to -807.[3]

¶11 Under the Umbrella Act, it is unlawful conduct to "practice or engage in any profession requiring licensure under [title 58] . . . if the person is . . . not licensed to do so or not exempted from licensure under [title 58]." *Id.* § 58-1-501(1)(a)(i); *see also id.* § 58-31b-801(1) (providing that APRNs licensed under the NPA are "responsible for confining [their] practice as a nurse to those acts and practices permitted by law"). Under the MPA, "[a] license is required to engage in the practice of medicine." *Id.* § 58-67-301(1).

¶12 In 2012, the legislature enacted the Cosmetic Medical Procedures bill, which comprehensively addressed the way that cosmetic medical procedures are regulated. *See* S.B. 40, 2012 Leg., Gen. Sess. (Utah 2012). Among other things, it added "cosmetic medical procedures" to the definition of the "[p]ractice of medicine" in the MPA.[4] *See id.* § 8; UTAH CODE § 58-67-102(19)(a)(i).

---

[3] For the relevant statutory provisions here, the language of the MPA and OMPA is nearly identical. Therefore, unless otherwise noted, references to the MPA also refer to the corresponding sections of the OMPA.

[4] Anderson argues that we should not look outside the NPA to determine the scope of an APRN's practice. But the Umbrella Act, which applies to all licensees, contains definitions for "ablative procedure" and "cosmetic medical procedure," both of which direct licensees to the MPA by stating that each term "means the same as that term is defined in Section 58-67-102." *Id.* § 58-1-102(1), (2)(a). Besides defining those two terms, the referenced section of the MPA also states that "cosmetic medical procedures" fall within the practice of medicine and sets forth specific exceptions. *Id.* § 58-67-102(19). Therefore, in determining whether APRNs are authorized to perform the ablative cosmetic medical procedures at

(continued . . .)

"Cosmetic medical procedure[s]" include "the use of cosmetic medical devices to perform ablative or nonablative procedures." *Id.* § 58-67-102(11)(a)(i). An "[a]blative procedure" is "a procedure that is expected to excise, vaporize, disintegrate, or remove living tissue." *Id.* § 58-67-102(1)(a). The parties do not dispute that the tumescent liposuction and fat grafting procedures performed by Anderson are ablative cosmetic medical procedures.

¶13 Although the bill added "cosmetic medical procedures" to the definition of the practice of medicine, it did not require that all such procedures be performed by a physician. Relevant here, the MPA provides that an "ablative cosmetic medical procedure" does not constitute the practice of medicine "if the scope of practice for the person performing the ablative cosmetic medical procedure includes the authority to operate or perform a surgical procedure." *Id.* § 58-67-102(19)(b)(ii); *see also id.* § 58-1-102(2)(b) (including a similar exception in the Umbrella Act's definition of "[c]osmetic medical procedure"). Thus, the parties agree that the question in this case is whether APRNs have "the authority to operate or perform a surgical procedure" so as to qualify for this exception to the practice of medicine. Anderson argues that such an authorization is baked into the broadly defined scope of practice for APRNs under the NPA, while the Department argues that the statutes contain no such authorization.

¶14 Our task then is to determine whether APRNs are statutorily authorized to operate or perform a surgical procedure within the meaning of the exception. "It is well settled that when faced with a question of statutory interpretation, our primary goal is to evince the true intent and purpose of the Legislature." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (cleaned up). We begin by looking at the plain language of the statute itself because the statutory language is "the best evidence of the legislature's intent." *Bagley v. Bagley*, 2016 UT 48, ¶ 10, 387 P.3d 1000 (cleaned up). "When the meaning of a statute can be discerned from its language, no other interpretive tools are needed." *Marion Energy, Inc.*, 2011 UT 50, ¶ 15 (cleaned up).

¶15 When interpreting a statute, we do not view the operative statutory language in isolation. *See Hertzske v. Snyder*, 2017 UT 4, ¶ 10, 390 P.3d 307. Instead, "we look at the provisions in the context

issue in this case, we look not only to the NPA, but also to the relevant provisions of the MPA.

of the entire statutory scheme." *Id.* Even if a particular provision, standing alone, might be "susceptible to competing interpretations," it "may nevertheless be unambiguous if the text of the act as a whole, in light of related statutory provisions, makes all but one of those meanings implausible." *Buck v. Utah State Tax Comm'n*, 2022 UT 11, ¶ 27, 506 P.3d 584 (cleaned up). To arrive at the correct interpretation, "each part or section [must] be construed in connection with every other part or section so as to produce a harmonious whole." *Hertzske*, 2017 UT 4, ¶ 12 (cleaned up).

¶16 We start with the language of the key provision, which states that an "ablative cosmetic medical procedure" does not constitute the practice of medicine "if the scope of practice for the person performing the ablative cosmetic medical procedure includes the authority to operate or perform a surgical procedure." UTAH CODE § 58-67-102(19)(b)(ii). This exception entered the Utah Code as part of comprehensive legislation in which ablative cosmetic medical procedures are generally reserved for physicians licensed to practice medicine under the MPA or OMPA. *See id.*; *see also id.* § 58-1-102(2)(b). The legislature created this exception for licensees whose scope of practice "includes the authority to operate or perform a surgical procedure," without defining either of those terms. *Id.* § 58-67-102(19)(b)(ii).

¶17 Anderson acknowledges that the NPA does not use the terms "operate" or "perform a surgical procedure." But she argues that because those terms are undefined, the legislature did not intend to require such an express authorization. We view the lack of definitions as cutting the other way. The terms the legislature chose to use—"operate" or "perform a surgical procedure"— mirror the express authorizations for other licensees. As noted in the Department's order, the "[p]ractice of dentistry" includes the authority to "examine, evaluate, diagnose, treat, *operate*, or prescribe therapy" for conditions relating to the mouth and maxillofacial region. *Id.* § 58-69-102(11)(a)(i) (emphasis added). And podiatrists are expressly authorized to "*perform . . . a surgical procedure* on a bone of the foot or ankle," subject to certain conditions and exceptions. *Id.* § 58-5a-103(1)(a) (emphasis added). The legislature would have no need to define "operate" and "perform a surgical procedure" if it intended to limit ablative cosmetic medical procedures to licensees whose authorizing statutes use those exact terms.

¶18 Anderson next argues that we should interpret the NPA as authorizing APRNs to perform surgery because the NPA does not expressly prohibit it. To make this point, Anderson directs us to explicit prohibitions in the licensing code for other types of licensees. *See, e.g., id.* § 58-16a-601(2)(a) (providing that optometrists "may not . . . perform surgery, including laser surgery"); *id.* § 58-73-601(3)(a) (providing that chiropractic physicians "may not . . . perform incisive surgery"). Anderson asserts that these explicit prohibitions show that if the legislature intends to bar licensees from performing surgery it will do so expressly and that the absence of such language in the NPA shows that the legislature intended to authorize APRNs to perform surgical procedures so long as those procedures fall within the generally accepted scope of practice for APRNs. But the exception at issue does not begin with the assumption that a nonphysician may perform ablative cosmetic medical procedures unless expressly *prohibited* from operating or performing a surgical procedure. *See id.* § 58-67-102(19)(b)(ii). The provision starts with the proposition that nonphysicians are prohibited from performing ablative cosmetic medical procedures and then carves out an exception for those who are *authorized* to operate or perform surgery. *See id.* The language of the statute indicates that an affirmative authorization is required.

¶19 Anderson also points out that neither the MPA nor OMPA uses the terms "operate" and "perform a surgical procedure" when defining the practice of medicine, even though it is undisputed that both physicians and osteopathic physicians are authorized to perform ablative cosmetic medical procedures. But this argument loses sight of the fact those terms are used to create an exception to the definition of the practice of medicine. *See id.* Because physicians are licensed to practice medicine, which expressly includes performing "cosmetic medical procedures," there is no need to use language in the exception that mirrors an express authorization in the MPA or OMPA. In short, we are not faced, as Anderson contends, with a statute that would be rendered inoperative if we apply the statutory language literally. Physicians, osteopathic physicians, dentists, and podiatrists would all fall within the

category of persons statutorily authorized to independently perform ablative cosmetic medical procedures.[5]

---

[5] Even if we accepted Anderson's interpretation as a plausible alternative reading of the exception, it would render the language ambiguous and open to interpretation using legislative history. *See Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 15, 267 P.3d 863 (explaining that, where statutory language is ambiguous, "we generally resort to other modes of statutory construction and seek guidance from legislative history" (cleaned up)). The legislative history surrounding the 2012 Cosmetic Medical Procedures bill confirms that the bill's sponsor contemplated that dentists and podiatrists would be the only nonphysicians authorized to independently perform ablative cosmetic medical procedures. When the bill was first introduced in the Health and Human Services Standing Committee, Senator Peter Knudson explained, "Under this bill, those who can do ablative cosmetic medical procedures are dentists, podiatrists, medical doctors, and osteopathic doctors." *Medical and Osteopathic Practice Act Amendments: Hearing on S.B. 40 Before the S. Comm. on Health & Human Servs.*, 2012 Leg., Gen. Sess. (Utah Feb. 22, 2012) (statement of Sen. Peter Knudson, Member, S. Comm. on Health & Human Servs.) (available at https://le.utah.gov/av/committeeArchive.jsp?timelineID=62656).

We are mindful that the statements of a single legislator, even one who sponsored the bill, cannot be attributed to the entire body and that the language ultimately enacted into law is the best evidence of legislative intent. *Cf. Zilleruelo v. Commodity Transporters, Inc.*, 2022 UT 1, ¶ 34, 506 P.3d 509 (explaining that statements from two legislators—even the bill's sponsors—"do not reflect the bill's text" and "should not be entitled to any weight when the statements contradict the plain language of a statute" (cleaned up)). But, as explained, we find it telling that the exception as enacted uses the language "operate" and "perform . . . a surgical procedure," which mirrors the pre-existing language in the chapters governing dentists and podiatrists, respectively. *See* UTAH CODE § 58-69-102(11)(a)(i); *id.* § 58-5a-103(1)(a). Those terms appear in no other licensing statutes. The sponsor's statement that the bill only allowed "dentists, podiatrists, medical doctors, and osteopathic doctors" to perform ablative cosmetic medical procedures, and the bill's use of terms found only in the statutes

(continued . . .)

9

¶20 In contrast to the statutes governing dentists and podiatrists, the NPA does not expressly authorize APRNs to either operate or perform surgical procedures. Instead, the NPA broadly defines the "[p]ractice of advanced practice registered nursing" as "the practice of nursing within the generally recognized scope and standards of advanced practice registered nursing as defined by rule and consistent with professionally recognized preparation and education standards." *Id.* § 58-31b-102(11). It includes "maintenance and promotion of health and prevention of disease," "diagnosis, treatment, correction, consultation, and referral," and the prescription and administration of certain drugs, including local anesthesia. *Id.* § 58-31b-102(11)(a)–(c). And DOPL has not adopted any rules governing APRNs that authorize them to operate or perform surgical procedures. Thus, unlike dentists and podiatrists, who are expressly authorized to operate or perform surgical procedures, APRNs do not have express authority to do so within their scope of practice.

¶21 Although the statute defining an APRN's scope of practice does not mention the authority to "operate" or "perform a surgical procedure," Anderson offers several reasons why we should read such an authorization into the statute. Her principal argument is that the term "correction" necessarily includes the ability to perform surgery to correct a condition. *See id.* § 58-31b-102(11)(b). She points out that the MPA does not expressly authorize physicians to perform surgery and theorizes that such an authorization stems from similar language in the MPA authorizing physicians to "correct" any human condition. The Department argues that a physician is authorized to perform surgery because the practice of medicine includes the authority to correct a condition by using "any means or instrumentality," *id.* § 58-67-102(19)(a)(i), language not included in the NPA.

¶22 But we have no need to resolve this debate because the exception at issue simply does not apply to physicians. Physicians are authorized to perform ablative cosmetic medical procedures not because they fall within the exception for licensees whose "scope of practice . . . includes the authority to operate or perform a surgical procedure," *id.* § 58-67-102(19)(b)(ii), but because

---

governing podiatrists and dentists, is consistent with our conclusion that "the authority to operate or perform a surgical procedure" was limited to express statements of that authority.

"cosmetic medical procedures" fall within the practice of medicine, *id.* § 58-67-102(19)(a)(i). Unlike physicians, who are wholly exempted from the restrictions on cosmetic medical procedures, APRNs must qualify for an exception by showing that their scope of practice includes the authority to operate or perform surgery. *See id.* § 58-1-102(2)(b). For the reasons explained above, we read the statute as requiring an express authorization to that effect. *See id.* § 58-69-102(11)(a)(i); *see also* § 58-5a-103(1)(a). The NPA's use of the broad term "correction" is not an authorization to operate or perform surgery within the meaning of the exception. *See id.* § 58-31b-102(11)(b).

¶23 Anderson also argues that the express authorization to prescribe and administer local anesthesia implies that APRNs are authorized to perform surgery. *See id.* § 58-31b-102(11)(c)(i). But as Anderson acknowledged during oral argument, "local anesthesia" is a broad category that includes any anesthesia that allows a patient to remain awake during the procedure. *See Anesthesia*, MEDLINEPLUS, https://medlineplus.gov/anesthesia.html (last visited June 24, 2025) (explaining that local anesthesia "numbs a small part of the body" while the patient remains "awake and alert"). Because local anesthesia is routinely used for nonsurgical procedures, including the type of nonablative cosmetic medical procedures that APRNs are expressly authorized to perform, it does not necessarily imply that the legislature intended to authorize APRNs to perform surgery.

¶24 Anderson further argues that because the scope of practice for APRNs is defined by referencing generally recognized standards, it includes any surgery of the type APRNs generally perform. The absence of an express authorization is not dispositive, she contends, because the NPA does not define the scope of practice for APRNs as a list of authorized procedures, but instead "employs a general set of criteria that can encompass a variety of potential procedures."

¶25 We recognize that simply saying "that the legislature could have spoken more clearly" typically "gets us nowhere." *Craig v. Provo City*, 2016 UT 40, ¶ 38, 389 P.3d 423. But given that the legislature selected terms used for other licensees, we would expect a similarly explicit authorization if the legislature had intended to include APRNs in the group of nonphysicians authorized to perform ablative cosmetic medical procedures. This is especially true here where the scope of an APRN's authority to perform

ablative cosmetic medical procedures was expressly addressed elsewhere in title 58 as part of the Cosmetic Medical Procedure bill.

¶26   That legislation placed strict limits on the types of cosmetic medical procedures that APRNs are allowed to perform. It defined "[c]osmetic medical procedure" to include ablative and nonablative procedures, UTAH CODE § 58-67-102(11)(a)(i), and distinguished those from superficial procedures, *id.* § 58-1-102(10)(b)(i). As noted above, ablative procedures are those "expected to excise, vaporize, disintegrate, or remove living tissue," not including hair removal or cyrolipolysis. *Id.* § 58-1-102(1); *id.* § 58-67-102(1). Nonablative procedures are those "expected or intended to alter living tissue, but not intended or expected to excise, vaporize, disintegrate, or remove living tissue." *Id.* § 58-1-102(10)(a)(i). On the other hand, "superficial procedure[s]" are considered nonablative. *Id.* § 58-1-102(10)(b)(i). "Superficial procedure[s]" are those "expected or intended to temporarily alter living skin tissue and may excise or remove stratum corneum"—or the surface of the skin—"but have no appreciable risk of damage to any tissue below the stratum corneum." *Id.* § 58-1-102(12).

¶27 The bill as enacted clarifies an APRN's authority to perform all three types of procedures: superficial, nonablative, and ablative. First, the Cosmetic Medical Procedure bill does not prohibit APRNs from performing superficial procedures that remove tissue from the surface of the skin because those procedures are expressly excluded from the definition of "cosmetic medical procedure." *Compare id.* § 58-67-102(11)(a)(i) (defining "[c]osmetic medical procedure" to include "the use of cosmetic medical devices to perform ablative or nonablative procedures"), *with id.* § 58-1-102(10)(b)(i) (defining a "superficial procedure" as nonablative).

¶28 Second, the enacted language expressly addresses an APRN's authority with respect to nonablative cosmetic medical procedures. *See id.* § 58-1-505(1)(b)(ii). Specifically, APRNs may supervise or personally perform nonablative cosmetic medical procedures. *See id.* § 58-1-506(2)–(4).

¶29 Finally, the enacted language expressly authorizes physicians to delegate two ablative cosmetic medical procedures to APRNs. A physician licensed under the MPA may delegate "the performance of an erbium full ablation resurfacing procedure or a CO2 fractionated resurfacing procedure" to an APRN if the

physician prescribes the treatment, indirectly supervises the APRN, and ensures that the APRN has "at least 50 hours of training specific to the procedure." *Id.* § 58-67-805(2). Viewed as a whole, the statutory language limits APRNs to performing only the two ablative cosmetic medical procedures identified and only when those procedures have been prescribed and delegated to the APRN by a licensed physician.

¶30  If we were to accept Anderson's argument, we would be hard pressed to assign meaning to the delegation provision. When interpreting the plain language of a statute we "avoid any interpretation which renders parts or words . . . inoperative or superfluous in order to give effect to every word of [the] statute." *Monarrez v. Utah Dep't of Transp.*, 2016 UT 10, ¶ 11, 368 P.3d 846 (cleaned up). If APRNs were among those with "the authority to operate or perform a surgical procedure," as Anderson argues, APRNs would be authorized to perform *any* ablative cosmetic medical procedure. There would be no need to provide an express exception allowing physicians to delegate two specific resurfacing procedures. Nor would there be any need to require indirect physician supervision or fifty hours of procedure-specific training. Anderson's reading of the scope of an APRN's practice would render the entire delegation provision superfluous. The Department's reading, in contrast, harmonizes the entire statutory scheme.

¶31 Finally, Anderson insists that interpreting the MPA as precluding APRNs from performing ablative cosmetic medical procedures prevents APRNs from removing warts or skin tags, procedures that APRNs routinely perform. Anderson does not address whether such procedures would fall within the definition of "superficial procedures" that the legislature has expressly carved out; because those procedures are not before us, we offer no opinion on the matter. But assuming that such procedures do constitute ablative cosmetic medical procedures, Anderson's argument that the statutory provisions unnecessarily limit an APRN's scope of practice must be directed to the legislature. A plain reading of the statutes as currently written prohibits APRNs from performing ablative cosmetic medical procedures such as the tumescent liposuction and fat grafting procedure at issue here.

## CONCLUSION

¶32  We decline to disturb the Department's order. The Utah Code limits the independent performance of ablative cosmetic

medical procedures to physicians and osteopathic physicians or those authorized to operate or perform a surgical procedure. Because the statutory scheme contains no such authorization for APRNs, the Department correctly determined that Anderson unlawfully engaged in the practice of medicine and exceeded the scope of her license.

———————